ROBERT B. RICHARDSON AND PEARL P. RICHARDSON (deceased), Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Richardson v. Commissioner
Docket No. 8156-82.
United States Tax Court
T.C. Memo 1984-595; 1984 Tax Ct. Memo LEXIS 81; 49 T.C.M. (CCH) 67; T.C.M. (RIA) 84595; November 9, 1984. George T. Bennett, for the petitioners. David L. Miller, for the respondent. GOFFE MEMORANDUM OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioners' Federal income tax for the taxable year 1978 in the amount of $22,027.06. The issue for decision is whether petitioners completed a gift of 1,442 shares of stock in Babcock & Wilcox Company to eight *82 charities before the payment of cash for 710 of the shares pursuant to a tender offer and before accrual of the right to dividend income for the shares. All of the facts have been stipulated and this case was submitted to this Court without trial pursuant to Rule 122. [1] The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference. At the time the petition was filed in this case, petitioner Robert B. Richardson (Mr. Richardson) resided in Helena, Montana, and petitioner Pearl P. Richardson was deceased. Prior to her death, Pearl P. Richardson had resided with Petitioner Robert B. Richardson, her husband, in Helena. Petitioners filed a joint Federal income tax return for the taxable year 1978 on April 15, 1979. Prior to her death on July 31, 1978, petitioner Pearl P. Richardson was beneficial owner of 1,442 shares of stock in Babcock & Wilcox Company (Babcock & Wilcox), a corporation, for a number of years. *83 The stock was held under Living Trust No. P-349 by the First Trust Company of Montana (Trust Company), with title to the stock held by the trustee. Petitioner Pearl P. Richardson sent a letter dated August 11, 1977, to the Trust Company withdrawing the stock from the living trust and requesting that the stock be delivered to the First National Bank & Trust Company of Helena, Montana (the Bank), which was "being instructed as to the disposition of such stock." A letter, also dated August 11, 1977, was sent to the Bank by petitioners. The pertinent portions of this second letter provide: Robert B. and Pearl P. Richardson have donated this stock to eight different charitable organizations as follows: First Presbyterian Church of Helena, Montana
642 shares
United Way of Lewis & Clark County, Inc.
200 shares
Shriners Hospital for Crippled Children
of Spokane, Washington
100 shares
St. Peter's Hospital of Helena, Montana
100 shares
Presidents Club of the University of
Michigan--Ann Arbor, Michigan
100 shares
P.E.O. Foundation of Des Moines, Iowa
100 shares
Rocky Mountain College of Billings, Montana
100 shares
Whitworth College of Spokane, Washington
100 shares
1442 shares
*84 A letter, copy of which is handed to you herewith, has been forwarded to each of the above charitable organizations in order that they may have a choice as to the disposal of the stock which has been donated to them. A form for their signature has been sent with each such letter together with instructions that they sign and return the form to Mr. Richardson promptly. Such forms, when received, will be delivered to you so that you will be in a position to act in connection with the ownership of the total 1442 shares. [Emphasis added.] Attached as exhibits to this second letter were a copy of letters from petitioner Robert B. Richardson to Ronald F. Waterman, chairman of United Way in Lewis and Clark County, and Howard Purcell, of St. Peter's Hospital, dated August 11, 1977, as well as an Urgent Memorandum, dated August 12, 1977, in which Mr. Richardson describes a form to be signed by the charitable recipients of the Babcock & Wilcox stock directing the Bank as to the disposition of the donated stock. On August 12, 1977, petitioners sent a similar letter and memorandum to each of the remaining charitable donees. Petitioners' letter described the effort by *85 United Technologies to take over Babcock & Wilcox by means of a cash offer to the shareholders of $48 per share. The letter went on to say that receipt of cash by petitioners would result in a "very substantial" tax liability, so [f]or the foregoing reasons, we have decided to donate her Babcock & Wilcox stock to several charitable organizations which we have supported over past years. The beneficial organizations can then decide if they wish to accept the offer of United Technologies at $48 per share. Such charitable organizations would not be subject to a tax liability if they accept the cash offer. On the other hand, should they decide to retain the stock subject to the uncertainties of the future, the stock will be issued in their names and forwarded to them. Consequently, Mrs. Richardson's [stock] has been delivered to [the Bank] to be held by them subject to the wishes of the several individual organizations. [Appropriate number] shares of Babcock & Wilcox Company stock with a value of [amount] have been donated by us to your organization and are being held subject to your wishes. [Emphasis added.] Petitoners' letter ended with instructions for completing *86 a form which, once executed by the donees, would direct the Bank to either: (1) exchange the donated shares for cash, (2) have the shares reissued by Babcock & Wilcox in the name of the charity, or (3) direct the Bank to exercise its best judgment in the disposition of the shares. Immediate action was urged because the United Technologies offer was to expire on August 25, 1977. The Urgent Memorandum accompanying petitioners' letter to each donee described a new tender offer at a price of $55 per share expiring August 22, 1977, made by J. Ray McDermott & Co., Inc. (McDermott). Again, petitioners urged the donees to make a prompt decision and return the authorization forms as quickly as possible. The authorization forms, bearing only the Bank's address as addressee, were executed and witnessed by the donees and are dated between August 8 and August 22, 1977. Each form contained language confirming the gift of either: "shares of Babcock & Wilcox Company stock which have been donated to us by Robert B. and Pearl P. Richardson" or "shares of * * * Babcock & Wilcox Company which has [sic] been donated to our organization by Robert B. and Pearl P. Richardson." Only *87 one donee, the P.E.O. Foundation, requested that the shares be reissued in the name of the charity while two other entities, St. Peter's Hospital and the Presidents Club of the University of Michigan, each directed the Bank to sell their shares for cash of $48 per share and $55 per share, respectively. The five remaining donees requested the Bank to use its best judgment with respect to the disposition of their shares. The contest between United Technologies and McDermott for Babcock & Wilcox shares peaked with a final offer by McDermott of $62.50 per share made on August 23, 1977, expiring September 3, 1977. All of the 1,442 shares of Babcock & Wilcox, except the 100 shares designated for the P.E.O. Foundation, were tendered to McDermott on August 22, 1977. Pursuant to the terms of the offer, McDermott purchased only 53 percent of the 1,342 shares tendered at a purchase price of $62.50 per share. As a result, 710 of the 1,342 shares tendered were sold to McDermott and the remaining 632 shares, which were not accepted by McDermott, were issued by Babcock & Wilcox directly to the named charities. The transfers of the tendered shares on the books of Babcock & Wilcox, *88 and issuance of new stock certificates, took place on September 16, 1977. The actual stock certificates were physically withdrawn from petitioner Pearl P. Richardson's Living Trust on September 12, 1977, by authorized representatives of the Bank, and were transmitted to the stock transfer agent for reissuance in the names of the donees. By letters dated September 19 or 20, 1977, the Bank, through Thomas Campbell, Trust Investment Officer, disbursed and transmitted checks to each of the donees, except the P.E.O. Foundation, for the shares purchased by McDermott. By letters dated October 6, 1977, the Bank forwarded stock certificates for the remaining 632 shares, which were not accepted by McDermott, and dividend checks issued by Babcock & Wilcox to each of the charitable donees except for the P.E.O. Foundation. These checks represented the final distribution under the terms of the tender offer from McDermott. By letter dated August 20, 1977, the P.E.O. Foundation requested that the Bank arrange to have Babcock & Wilcox reissue the stock in the donee's name. In a letter dated October 26, 1977, the P.E.O. Foundation wrote to the Bank to inquire as to the status of its *89 request. The Bank replied, by letter dated October 28, 1977, that the stock was sent to petitioners and then was forwarded by petitioners to the P.E.O. Foundation. A stock certificate for 100 shares was issued to the P.E.O. Foundation by Babcock & Wilcox on October 3, 1977. On August 24, 1977, in the interim period between August 11, 1977 (the date of petitioners' letter to the Bank), and October 3, 1977, (the date upon which the last stock certificate was issued), two separate dividends were declared: a regular quarterly dividend of 37-1/2 cents per share and a special dividend of $2.50 per share, both payable October 3, 1977, to shareholders of record as of September 15, 1977, with the exdividend date being September 9, 1977. The total dividend income paid with respect to the 1,442 shares of Babcock & Wilcox stock as a result of this declaration was $4,145.75. The dividends were sent directly to the donees by the Bank. Petitioner Pearl P. Richardson filed a Federal gift tax return for the fourth quarter of the taxable year 1977. Listed on Schedule A to that return were charitable gifts to the eight donees of 721 shares of Babcock & Wilcox stock valued at $45,090.94 as of *90 October 6, 1977. On petitioners' joint Federal income tax return for the taxable year 1977, petitioners claimed a charitable contribution deduction of $90,171.87 as the value of 1,442 shares of Babcock & Wilcox stock donated to the eight donees. The claimed amount was in excess of the percentage limitations of section 170(d), and thus a carryover deduction was claimed on petitioners' return for the taxable year 1978. In calculating the amount of the total deduction for the contribution of the Babcock & Wilcox shares, petitioners computed the value of the contribution by multiplying $62.125 per share for 53 percent of 1,442 shares sold to McDermott, $56.50 (the value as of September 22, 1977) for the remaining 47 percent of the shares that were issued directly by Babcock & Wilcox to the donees, and $2.875 per share for all of the shares in dividend income, for a fair market value per share of $62.5325.[2] Petitioners did not include either of the two dividends declared on August 24, 1977, as income on their return for the taxable year 1977. *91 Petitioner Robert B. Richardson sent a letter dated January 10, 1980, to Internal Revenue Service Agent Robert Rogers detailing his disagreement with statements made by Agent Rogers in a letter that is not part of the record in this case. Portions of his letter read: On August 11, 1977 Mrs. Richardson asked the First Trust Company to turn this stock over to the First National Bank, subject to our instructions. Even before I was able to notify the various charitable organizations concerned, the J. Ray McDermott Company started competing with the United Technologies Company in an attempt to acquire ownership of Babcock & Wilcox. Consequently, I got in touch with all of the charitable organizations, informing them that the definite gift had not as yet been made but would await developments. On August 25 the J. Ray McDermott Company increased their offer for the Babcock & Wilcox stock and United Technologies withdrew from the competition. I immediately, on August 25, got in touch with all eight of the charitable organizations involved and told them that our gift was final and complete and that we would act in accordance with their wishes as to whether they desired *92 to submit their stock for cash and a special dividend or whether they desired to retain the Babcock & Wilcox stock--which it was their privilege to do. As you are aware, seven of the organizations elected to submit their stock to the McDermott Company while one desired to receive the original Babcock & Wilcox stock. Accordingly, I informed the First National Bank to send in the stock in accordance with the wishes of the eight charitable organizations. They could not have submitted the stock under the name of Richardson because the actual stock certificate was in the name of the nominee for the First Trust Company and not in Mrs. Richardson's name. * * * Of course, I should have preferred to have the shares issued to each one of the organizations, but this was impossible to do because the offer was to expire on September 3 and the Transfer Agent informed me that it would be impossible to reissue the stock in the names of the various organizations and send it to them to take advantage of the McDermott offer. In conclusion, I might say that it is my firm opinion that the stock was contributed to these organizations on August 25 by means of our telephone conversations *93 of that date. You can realize why it was impossible for me to contact these organizations through correspondence in order that they might take advantage of the offer which was expiring on September 3. Also, I might state that previous to August 26, each of the organizations had furnished the First National Bank with a written statement, giving the bank authority to act for them whenever the stock was definitely contributed to them. On January 22, 1982, the Commissioner issued a statutory notice of deficiency to petitioners for the taxable year 1978. The Commissioner determined that petitioners had control of the 1,442 shares of Babcock & Wilcox stock until September 16, 1977, when 632 shares were transferred on the books of Babcock & Wilcox to seven charities, and until October 3, 1977, when 100 shares were transferred to P.E.O. Foundation. The proceeds from the sale of 710 shares, 53 percent of the 1,342 shares of stock tendered to McDermott, in the amount of $44,108.78, were considered to be a sale by petitioners, followed by a donation of the cash proceeds to the charities. The Commissioner computed a long-term capital gain on the 710 shares of $39,848.78, [3] and added 50 *94 percent of such amount to the taxpayers' income in computing the deficiency. The Commissioner also determined that petitioners realized dividend income in the amount of $3,858.25. [4] The additional income caused by the attribution of the stock sales and dividends to the petitioners increased petitioners' adjusted gross income, and thus increased the charitable contribution deduction available under the percentage limitation of section 170(d) for the taxable year 1977 by $34,339.84, and decreased the charitable contribution deduction for the taxable year 1978 by $34,153.61. After an adjustment caused by using the date of transfer on Babcock & Wilcox' books as the valuation date for the donated stock, the amount of deficiency for the taxable year 1978 was determined to be $22,027.06. *95 The only issue for decision is whether petitioners completed a gift of 1,442 shares of Babcock & Wilcox stock to eight charities before the payment of cash for 710 of the shares pursuant to a tender offer and before accrual of the right to dividend income for the shares. If the gift was complete before the acceptance of the tender offer and the record dates for the dividend, petitioners are entitled to a charitable contribution carryover for the taxable year 1978. If the gift was not completed before these events occurred, the value of the gift does not exceed the contribution limitations of section 170(d), and no carryover is available for the taxable year 1978. The date upon which the gift was completed is therefore critical. Respondent contends that actual transfer on the books is a prerequisite to a completed gift of stock, relying upon section 1.170A-1(b), Income Tax Regs., the pertinent parts of which read: Ordinarily, a contribution is made at the time delivery is effected. * * * If the donor delivers the stock certificate to his bank or *96 broker as the donor's agent, or to the issuing corporation or its agent, for transfer into the name of the donee, the gift is completed on the date the stock is transferred on the books of the corporation. Alternatively, respondent argues that the Bank was petitioners' agent, rather than agent for the donees and that petitioners thus did not relinquish dominion and control over the stock when the stock was transferred from the Trust Company to the Bank. Particular reliance is placed on the perceived continuation of dominion and control evidenced by petitioners' letters to the donees, and on the description of the events in petitioner Robert B. Richardson's letter to respondent's agent three years after the events at issue. Petitioners argue that the gift was completed upon transfer from the Trust Company to the Bank on August 11, 1977. Alternatively, petitioners argue that each gift was completed on the date upon which each donee returned the authorization form containing an acknowledgment and acceptance of the gift. The Bank is described as either an agent, trustee or corporate bailee for the donees. Petitioners argue that their donative intent is shown by the correspondence *97 to the Trust Company, the Bank and to the donees, and acknowledged by the actions of all concerned parties. Petitioners argue further that they sent letters to the donees only to facilitate the donees' decisions as to acceptance of the tender offer. As delivery to the Bank was by letter rather than certificate, petitioners contend that they took all steps possible to accomplish delivery and relinquishment of dominion and control, and argue that book transfer of title was not mandatory for completion of the gift under these particular circumstances.Petitioners contend that the delay in transferring title to the certificates on the corporate books was merely a necessary result of the tender offer timetable, and did not negate effective delivery. A charitable contribution is synonymous with a gift, DeJong v. Commissioner,36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962), and therefore the requirements for a valid inter vivos gift must be met. The essential elements of a bona fide inter vivos gift, as set forth in Weil v. Commissioner,31 B.T.A. 899 (1934), *98 affd. 82 F.2d 561 (5th Cir. 1936), cert. denied 299 U.S. 552 (1936), are: (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, inpraesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee * * * [31 B.T.A. at 906, quoted with approval in Guest v. Commissioner,77 T.C. 9, 16 (1981).] The competency and capability of the donor and acceptance by the donees are not in question. However, there must also be a present intention to make the gift and "certain ritualistic or ceremonial conduct involving relinquishment by the donor of what is called 'dominion' or 'control.'" Richardson v. Commissioner,126 F.2d 562, 567 (2d Cir. 1942), *99 modifying 39 B.T.A. 927 (1939). Petitioners' letters to the Trust Company, the Bank and the donees clearly reflect a clear and present intention to donate the stock, subject only to the donees' decisions as to the form of receipt: cash or stock. The points of controversy are the irrevocability of the transfer and the effectiveness of the delivery. Petitioners argue that the transfer accomplished by their letter to the Bank was irrevocable in that it created a trust under Montana State law: Voluntary trust -- how created as to trustor. * * * [A] voluntary trust is created, as to the trustor and beneficiary, by any words or acts of the trustor indicating with reasonable certainty: (1) an intention on the part of the trustor to create a trust; and (2) the subject, purpose and beneficiary of the trust. [Mont. Code Ann. sec. 72-20-107 (1977).] An intention to create a trust need not be expressed in any particular words of art, but may be in language indicating that a third party is to hold the property for the benefit of the donees. Richardson v. Commissioner,supra; *100 Dulin v. Commissioner,70 F.2d 828 (6th Cir. 1934); Grissom v. Sternberger,10 F.2d 764 (4th Cir. 1926). Although petitioners did not use the word "trust," the letters to the Trust Company, the Bank, and the donees contain a clear and direct expression by the trustors of an intent to create a trust. Eckart v. Hubbard,184 Mont. 320,    , 602 P.2d 988, 991 (1979). The subject of the trust is specified as the Babcock & Wilcox stock that petitioners previously requested that the Trust Company transfer to the Bank. The beneficiaries, the charitable donees, are specifically named. The purposes of the trust are to transfer the ownership of the stock from petitioners to the Bank as trustee for the donees, and to enable the donees to take advantage of the outstanding tender offers. Such a clear description of purpose is, by itself, sufficient to expressly or impliedly indicate an intent that its accomplishment be through the use of a trust. Bogert, Trusts and Trustees, sec. 46, p. 497 (2d ed. rev. 1984). Creation of a trust under Montana *101 law also requires acceptance by the trustee: Voluntary trust -- how created as to trustee. * * * [A] voluntary trust is created, as to the trustee, by any words or acts of his indicating with reasonable certainty: (1) his acceptance of the trust or his acknowledgment, made upon sufficient consideration, of its existence; and (2) the subject, purpose, and beneficiary of the trust. [Mont. Code Ann. sec. 72-20-108 (1977).] The Bank demonstrated acceptance of its responsibilities as trustee by several acts: (1) the tendering of the shares on behalf of the donees, (2) the remittance of the tender offer proceeds and dividends to the donees, and (3) the transmittal of share certificates to the transfer agent and to the donees. These acts were all accomplished in accord with specific, written instructions from the donees, and furthered the purposes of the trust. Although the shares issued in the name of P.E.O. Foundation were mailed to petitioners, this appears to have been a clerical error that was immediately rectified. All other actions taken comport with an acceptance by the Bank of the responsibilities of a trustee. Wood v. Robbins,67 Mont. 409, 412, 215 P. 1101 (1923). *102 Having reviewed all of the evidence, we find that the first overt act by the Bank showing acceptance of its position as trustee for the benefit of all eight beneficiaries are the tender of the Babcock & Wilcox stock to McDermott on August 22, 1977. The latest acceptance by a donee was on that same date. Once established and accepted by trustee and beneficiaries, the trust is irrevocable. Montana State law provides that: A trust cannot be revoked by the trustor after its acceptance, actual or presumed, by the trustee and beneficiaries, except by the consent of all the beneficiaries, unless the declaration of trust reserves a power of revocation to the trustor, and in that case the power must be strictly pursued. [Mont. Code Ann. sec. 72-23-502 (1977).] Respondent, however, asserts that, under section 1.170A-1(b), Income Tax Regs., a gift of stock is not complete, even if irrevocable, until delivery by actual transfer upon the books of the corporation. The regulation cited by respondent has been interpreted to require delivery sufficient to show *103 that the gift has been placed beyond the dominion and control of the donor. Londen v. Commissioner,45 T.C. 106 (1965). As petitioners were not the title owners on the certificates, petitioners' letters to the Trust Company and the Bank were the only method available to petitioners to initiate the transfer and subsequent delivery. The Bank had the right to and could have obtained the actual certificates from the Trust Company at any time after August 11, 1977, without further action by petitioners. The fact that the Bank chose not to do so was not within the control of petitioners. Once the Bank tendered the stock on behalf of the donees on August 22, 1977, however, the delivery was both irrevocable and complete. The facts in the present case are distinguishable from those in Londen,supra, where a taxpayer with a controlling interest in a corporation delivered a certificate for stock in that corporation to an individual employed by the same corporation. The taxpayer endorsed the certificate in blank in March 1958 and gave oral instructions as to the proposed donation in December 1958. The actual transfer on the corporate books took place *104 in January 1959. The Court held that the taxpayer had the power to recall the gift at any time prior to the actual transfer on the corporate books. [5]
In this case, however, there is no evidence that petitioners either asserted or had the right to assert any control over the actions of the Trust Company, the Bank or the donees, nor was it possible for petitioners to recall the gift after the Bank and donees accepted the trust. Petitioners' correspondence with the donees during the period of the tender offer is not evidence of continued control and dominion, but rather serves only as information and advice. Holdeen v. United States,297 F.2d 886, 889-890 (2d Cir. 1962). None of petitioners' actions are inconsistent with a completed gift. This case is also distinguishable from the factual situation in Guest v. Commissioner,supra. On December 15, 1969, the taxpayer *105 sent a letter to the donee stating, "I am contributing to you certain properties." The donee accepted on December 17, 1969, but requested that the taxpayer retain title to the properties as its nominee until the donee completed negotiations for its sale. The title was not transferred from the taxpayer individually to taxpayer as trustee or nominee. The taxpayer transferred the properties directly to the purchaser of the property by a deed dated December 31, 1969, but not acknowledged until April 10, 1970. We found that delivery was not effected by virtue of [taxpayer's] retention of the properties as the temple's trustee because there was no actual legal transfer of ownership. * * * [N]o evidence establishing a trust relationship was presented and the petitioner retained substantial control until actual title to the properties was transferred to the purchasers. [Guest v. Commissioner,supra at 17.] As the taxpayer failed to prove that the deeds were executed prior to the acknowledgment, delivery was determined to have occurred in 1970. In contrast, petitioners in this case did establish a trust for the donees using an independent third *106 party as trustee, effectively removing any potential for the exercise of control despite the failure to accomplish titular transfer on the corporate books. In holding that delivery was accomplished prior to actual transfer on the books of Babcock & Wilcox, we do not contest the "strong presumption of validity" of section 1.170A-1, Income Tax Regs.Londen v. Commissioner,supra at 110. We merely hold that the sentence in question of the regulation is inapplicable as delivery was neither to petitioners' agent nor was delivery made to the issuing corporation or its agent. Petitioners delivered their interest in the certificates to the Bank, an independent third party trustee for the donees. As the factual circumstances requiring transfer on the corporate books are not present, the contribution is complete at the time that delivery is effected under the general standards of section 1.170A-1(b), Income Tax Regs. We hold that delivery was effected on August 22, 1977, upon tender of the stock by the Bank to McDermott creating an irrevocable trust. Weil v. Commissioner,supra. *107 As August 22, 1977, is before both the sale of stock under the tender offer and the record date for the two dividends, neither the sale proceeds nor the dividends were income to petitioners in the taxable year 1977. In weighing the evidence to reach this decision, we have discounted almost totally the conclusionary language in petitioner Robert B. Richardson's letter dated January 10, 1980, to respondent's agent. The chronology and dates in the letter are in direct conflict with the facts shown in the documents written contemporaneously with the donation. Petitioners' characterization of the donation as incomplete until August 25th is not supported by any of the stipulated evidence and is therefore not credible. As the parties have stipulated that the fair market value of each share of Babcock & Wilcox stock was $56.5625 on August 22, 1977, the value of the contribution made by petitioners to the eight donees was $81,563.13. As this amount exceeds the maximum allowable charitable contribution available to petitioners under section 170(d) for the taxable year 1977, petitioners are entitled to deduct the excess contribution on their return for the taxable year 1978. *108 As the carryover is less than the amount originally deducted on petitioners' return for the taxable year 1978, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, and attendant regulations as amended in effect for the relevant years, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. These values, when multiplied, result in amounts of $47,479.65, $4,145.75, and $28,292.31, respectively, for a total of $89,917.71, or $62.356 per share -- $259.56 less than the total amount of the claimed contribution. All but $5.40 of the variance is accounted for by a transposition in the value of each 100 shares of stock from the figure of $6,235.25 to $6,253.25. This computation makes no allowance for the fact that the P.E.O. Foundation tendered no shares. There is also no explanation of the use of $62.125 per share for the tendered stock instead of the $62.50 figure of the final tender offer. Use of the latter figure would give a new total of $90,204.31, or $32.44 more than the amount claimed as a Contribution on petitioners' return for the taxable year 1977.↩
3. This computation again uses $62.125 per share sales price less a cost basis of $6.00 per share. ↩
4. This amount for the October 1977 dividend is $287.50 less than the total amount of stipulated dividends.The Commissioner has neither amended his determination of deficiency to account for the variance nor has respondent alleged an increased deficiency in his Answer based upon the larger amount of dividend income.↩
5. Similarly, in Currey v. Commissioner,T.C. Memo. 1981-40↩, the taxpayer directed her own bank to transfer the shares to the donees and did not transfer the shares to an independent third party for further directions from the donees as was done here.