# United States Tax Court

T.C. Memo. 2023-34

ESTATE OF SCOTT M. HOENSHEID, DECEASED, ANNE M.
HOENSHEID, PERSONAL REPRESENTATIVE,
AND ANNE M. HOENSHEID,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 18606-19.                           Filed March 15, 2023.

————

*Steven S. Brown*, *William Gibbs Sullivan*, and *Adam M. Ansari*, for
petitioners.

*Megan E. Heinz*, *Alexandra E. Nicholaides*, and *Lauren M. Simasko*, for
respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, *Judge*:  This case is before the Court on a Petition filed in
response to a statutory notice of deficiency issued to petitioners for the
tax year 2015.  It involves the contribution of appreciated shares of stock
in a closely held corporation to a charitable organization that
administers donor-advised funds for tax-exempt purposes under section
501(c)(3).[1]  The contribution was made near contemporaneously with the

---

[1] Unless otherwise indicated, all statutory references are to the Internal
Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation
references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all
relevant times, and all Rule references are to the Tax Court Rules of Practice and
Procedure.

[*2] selling of those shares to a third party. After concessions,[2] the issues for decision are (1) whether and when petitioners made a valid contribution of the shares of stock; (2) whether petitioners had unreported capital gain income due to their right to proceeds from the sale of those shares becoming fixed before the gift; (3) whether petitioners are entitled to a charitable contribution deduction; and (4) whether petitioners are liable for an accuracy-related penalty under section 6662(a) with respect to an underpayment of tax.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference. Petitioners resided in Michigan when their Petition was timely filed.

### I. *Commercial Steel Treating Corp. (CSTC)*

CSTC was founded in 1927 by Ralph Hoensheid (Mr. Hoensheid) and members of the Hoensheid family. CSTC has historically engaged in the business of heat-treating metal fasteners for use in automobiles and other commercial vehicles. Mr. Hoensheid's son, Merle, later established a separate manufacturing facility in order to provide engineered coatings for fasteners, which was incorporated as a subsidiary of CSTC, named Curtis Metal Finishing Co. The ownership of CSTC remained in the family, and as of January 1, 2015, CSTC was owned by Mr. Hoensheid's grandchildren Scott Hoensheid (petitioner) and his two brothers Craig P. Hoensheid and Kurt L. Hoensheid (two brothers) with each holding an equal one-third share of the outstanding stock. As of June 11, 2015, petitioner, his two brothers, Jack R. Howard, and William A. Penner made up the board of directors of CSTC.

### II. *Fidelity Charitable*

Fidelity Charitable Gift Fund (Fidelity Charitable) is a tax-exempt charitable organization under section 501(c)(3). Fidelity Charitable is primarily engaged in administering donor-advised funds as a sponsoring organization. Under Fidelity Charitable's donor-advised fund program, donors can establish a giving account with Fidelity Charitable by completing and submitting a donor application

---

[2] Respondent has conceded that petitioners are not liable for a penalty under section 6662(a) with respect to the underpayment determined in the notice of deficiency resulting from a disallowed charitable contribution deduction.

[*3] and making an irrevocable cash or noncash asset contribution. After a giving account is established and a contribution made, donors have retained advisory privileges over three things: (1) how to invest the funds, (2) which public charities will receive grants, and (3) the timeline for making grants, subject to some minimum activity requirements. Fidelity Charitable typically requires proof of transfer in the form of a stock certificate and formal acceptance by Fidelity Charitable to complete a contribution of shares of a privately held corporation that issues stock certificates. The general policy of Fidelity Charitable is to liquidate noncash contributed assets as quickly as possible after contribution.

III.    *The Transaction & Contribution*

In the fall of 2014 Kurt informed petitioner and Craig of his intention to retire from CSTC. Petitioner and Craig did not want CSTC to incur debt to finance a redemption of Kurt's 33% interest in CSTC, so they instead decided to pursue a potential sale of CSTC.[3] As of December 12, 2014, CSTC had established an amended Change in Control Bonus Plan, which granted certain employees a potential right to bonus compensation in the event of a change in control of CSTC, such as a transfer of more than 80% of CSTC's stock to third parties.

In the end, CSTC chose to engage FINNEA Group as its financial adviser in connection with a sale of CSTC. FINNEA Group is a sell-side investment banking firm. Brian Dragon, senior managing director of FINNEA was the main collaborator for CSTC and petitioner. Both petitioner and Mr. Dragon considered $80 million to be a fair target price for CSTC. Thus, the engagement letter executed by petitioner on behalf of CSTC stated that CSTC would pay FINNEA a fee of 1% of the ultimate transaction's value up to $80 million and 5% of the ultimate transaction's value over $80 million. The engagement letter, however, did not include any mention of appraisal or valuation services in connection with the transaction.

In early 2015 FINNEA began soliciting bids for CSTC and received several letters of intent to purchase the company from interested private equity firms. HCI Equity Partners (HCI), a Washington, D.C. based private equity firm which focuses in part on acquiring companies in the automotive industry, was one of the

---

[3] Two other brothers, Mark Hoensheid and Ralph Hoensheid, had retired from CSTC in previous years.

[*4] interested parties. On April 1, 2015, HCI submitted a letter of intent to acquire CSTC for total consideration of $92 million.

Meanwhile, in mid-April 2015, petitioner began discussing the prospect of establishing a Fidelity Charitable donor-advised fund to make a presale charitable contribution of some of his CSTC stock with his wealth advisers, Richard Balamucki and Casey Bear, and Andrea Kanski, his longtime tax and estate planning attorney at Clark Hill PLC.

On April 16, 2015, Ms. Kanski emailed John Hensien, a corporate attorney at Clark Hill and CSTC's merger and acquisition partner. In the email, Ms. Kanski mentioned that petitioner was considering donating some of his CSTC stock to charity "to avoid some capital gains" and noted that "the transfer would have to take place before there is a definitive agreement in place." Ms. Kanski also requested that Mr. Hensien inquire as to FINNEA's capability to prepare a qualified appraisal to establish the value of the charitable gift; "since they have the numbers, it would seem to be the most efficient method."

On April 20, 2015, after discussions with representatives of Fidelity Charitable, Mr. Balamucki emailed petitioner and Ms. Kanski to inform them that Fidelity Charitable had brought up a "concept called the 'anticipatory assignment of income' which makes the timing of the gift very important." Mr. Balamucki added that "it must be a completed gift before any purchase agreement is executed or else the IRS can come back and try and impose the capital gains tax on the gift." Fidelity Charitable provided petitioners' wealth advisers with a Letter of Understanding to be executed in advance of the gift. On April 21, 2015, Ms. Kanski responded to Mr. Balamucki and petitioner, stating that "the deadline to assign the stock to a donor advised fund is prior to execution of the definitive purchase agreement" and suggesting that they "gather the forms and documents from Fidelity so we're ready to go and the paperwork is done well before the signing of the definitive purchase agreement." Petitioner responded in an email to Ms. Kanski with the following:

> Anne and I have agreed that we want to put 3.5MM in the fund, but I would rather wait as long as possible to pull the trigger. If we do it and the sale does not go through, I guess my brothers could own more stock than I and I am not sure if it can be reversed. I have not definitively given Richard a number. Please know this and help us plan accordingly.

**[*5]**  On April 23, HCI, CSTC, petitioner, and his two brothers executed a nonbinding letter of intent,[4] establishing the parties' mutual interest in HCI's acquisition of CSTC for total consideration of $107 million.  The letter of intent did not include any breakup fee provision to compensate HCI if the transaction was not finalized.   After the execution of the letter of intent, HCI began the process of conducting due diligence into CSTC's business and financial operations.

In mid-May counsel for HCI and CSTC began negotiating a contribution and stock purchase agreement based on the terms of the letter of intent.  Ms. Kanski was not involved in the drafting process but was provided with copies of each draft and was kept up to date on the progress of the negotiations.  On May 21, 2015, Ms. Kanski noted in an email to Messrs. Balamucki and Bear and petitioner: "We now have a draft purchase and sale agreement; do you have the information from Fidelity for my review?"  Petitioner responded that he had not yet signed the Letter of Understanding document provided by Fidelity Charitable; Ms. Kanski replied that she "want[ed] to make sure that nothing slips and all of your advisors are on the same page so that there are no issues with the charitable deduction."  On May 22, pursuant to 16 C.F.R. § 803.5(b), petitioner executed a notarized Affidavit of Acquired Person on behalf of CSTC, representing that CSTC had "a good faith intention of completing the transaction."

On June 1, Mr. Bear emailed to Kurt Chisholm, a representative of Fidelity Charitable, a Letter of Understanding signed by petitioner which described the planned donation as being of shares of CSTC stock but did not specify the number of shares.  The terms and conditions of that Letter of Understanding stated inter alia that (1) "As holder of the Asset, Fidelity Charitable is not and will not be under any obligation to redeem, sell, or otherwise transfer the asset" and (2) "No contribution is complete until formally accepted by Fidelity Charitable." Furthermore on June 1, 2015, petitioner emailed Ms. Kanski requesting that she prepare a shareholder consent agreement allowing him to transfer a portion of his stock to Fidelity Charitable.[5]  In the email, petitioner reiterated to Ms. Kanski that "I do not want to transfer the stock until we are 99% sure we are closing."

---

[4] The letter of intent was binding on the parties with respect to confidentiality and a 60-day exclusivity period for negotiations.

[5] Petitioner and his two brothers were parties to a Buy-Sell Agreement that restricted their ability to dispose of their shares of CSTC stock.

**[\*6]**     On June 11, 2015, CSTC held its annual shareholders meeting, at which petitioner and his two brothers were present and unanimously approved petitioner's request for "ratification of the sale of all outstanding stock of Commercial Steel Treating Corporation to HCI." As part of that approval, petitioner and his two brothers "acknowledge[d] that they have been involved throughout the process, understand and accept all terms associated with the transaction;" the minutes also noted that "a formal Consent Resolution authorizing the recapitalization will be developed as part of the closing documents" and "will be distributed for all Board members [sic] signature." Craig and Kurt also unanimously approved petitioner's request to be able to transfer a portion of his stock to Fidelity Charitable and executed a Consent to Assignment agreement to that effect. The Consent to Assignment agreement had a blank space for the parties to specify the number of shares and stated that the consent governed "only the number of shares identified above." However, that field was left blank and not filled in on June 11, when the parties signed the agreement, nor on June 15, 2015, when petitioner emailed a copy of the signed agreement to Ms. Kanski.[6]

Immediately following the shareholder meeting, CSTC held a board meeting. The directors unanimously approved petitioner's request to be able to transfer a portion of his shares to Fidelity Charitable. The directors also unanimously approved a resolution to dissolve CSTC's Incentive Compensation Plan for executives and to distribute all remaining balances "prior to the recapitalization of the corporation." At some point after the June 11, 2015, board meeting, petitioner had a stock certificate partially prepared for the eventual transfer to Fidelity Charitable. Petitioner kept the incomplete stock certificate on his office desk until July 9 or 10, 2015, when he dropped it off at Ms. Kanski's office.

On June 12, 2015, HCI's Investment Committee and managing partners unanimously approved the acquisition of CSTC, subject to completion of their financial and business due diligence. On June 30, consultants hired by HCI completed and delivered a due diligence report

---

[6] During the examination of petitioners' 2015 return, Ms. Kanski produced to the examining revenue agent a copy of the Consent to Assignment agreement, with a number of "1380" shares hand-written onto the blank line. At trial petitioner confirmed his handwriting inserting the number of shares and testified that he had prepared and signed the agreement on June 11, 2015, before his two brothers signed it.

[*7] addressing potential environmental liability issues arising out of CSTC's existing facilities.

Negotiations between CSTC and HCI began to gather steam. On July 1, HCI's counsel prepared a revised draft of the Contribution and Stock Purchase Agreement. This draft, dated July 1, 2015, included a new, partially blank recital (share contribution provision) stating in relevant part: "On June 2015, Scott M. Hoenshied [sic] transferred . . . shares of Common Stock to . . . ." Furthermore, on July 1, HCI prepared and circulated the initial draft of the Minority Stock Purchase Agreement for a purchase of shares from Fidelity Charitable. The draft Minority Stock Purchase Agreement included a clause appointing petitioner as seller's representative with authority to, inter alia, (1) accept delivery of, on behalf of the Seller [Fidelity Charitable], all such documents as may be deemed . . . to be appropriate to consummate this Agreement;" and (2) "to endorse and to deliver on behalf of the Seller [Fidelity Charitable], certificates representing the Shares." Counsel for CSTC forwarded the draft to petitioner with this message: "Attached is the initial draft of the purchase agreement for the shares you have/intend to gift."

On July 6, 2015, HCI caused the organization of a Delaware corporation, CSTC Holdings, Inc., for the purpose of acquiring shares of CSTC. That same day petitioner emailed Messrs. Bear, Balamucki, and Hensien and Ms. Kanski, circulating the draft Minority Stock Purchase Agreement and stating inter alia: "We are not totally sure of the shares being transferred to the charitable fund yet" and "[h]opefully, and based on the closing documents, we will have a much better handle on this come Wednesday or Thursday of this week." Petitioner added: "Once we know the share values, I am confident Andrea will execute the stock assignment as required." The next day, July 7, petitioner emailed Mr. Bear to inform him that CSTC would "sweep the cash from the company prior to closing and distribute it to the brothers." That same day, Mr. Bear emailed Mr. Chisholm and Ryan Boland, Fidelity Charitable's vice president for national corporate and executive giving. In the email Mr. Bear noted that he was "concerned" with the clause in the Minority Stock Purchase Agreement appointing petitioner as seller's representative for Fidelity Charitable; Mr. Bear suggested that the clause instead appoint one of CSTC's corporate attorneys as seller's representative. Also on July 7, petitioner executed an amendment to CSTC's Change in Control Bonus Plan, specifying that the impending sale to HCI would constitute a change in control and thus trigger bonus payments to key employees.

[*8] On July 9, 2015, CSTC prepared a revised draft of the Contribution and Stock Purchase Agreement. In this revised draft, counsel for CSTC had partially filled in the recital relating to the gift transfer to read in relevant part: "On July . . . 2015, [petitioner] transferred 1,380 shares of Common Stock to The Fidelity Investments Charitable Gift Fund." Furthermore, the revised draft added that one of the conditions precedent to the obligations of the buyer was that "[t]he Fidelity Investments Charitable Gift Fund shall have executed and delivered to HCI and the Buyer the Minority Stock Purchase Agreement."[7]

In a reply to Mr. Bear's email the same day, Mr. Boland agreed that "[o]ne of the corporate attorneys would be a much better fit, from our perspective." Later that same day, Mr. Bear informed Mr. Boland in an email that "it looks like Scott has arrived at 1380 shares—which will come out to about $3,000,000" and that Mr. Bear would "have the stock certificate shortly." Petitioner in a subsequent email to Messrs. Bear and Balamucki noted that "Andrea is completing the Stock transfer of 1380 shares to the Charitable account" and requested his account number from Fidelity Charitable. Mr. Bear then forwarded the email to Messrs. Boland and Chisholm and requested the account number. Mr. Chisholm replied to Mr. Bear the following morning, Friday, July 10, noting that "it appears as though Scott does not yet have a Giving Account created with us" and providing a link to the account setup process on Fidelity Charitable's website. Later that day, petitioner set up an online giving account with Fidelity Charitable.

Additionally, on July 10, 2015, HCI prepared a revised draft of the Contribution and Stock Purchase Agreement. Nevertheless, the share contribution provision was still missing a specific date when petitioner transferred the shares to Fidelity Charitable. However, this draft update did propose to resolve the environmental liability issue by including a provision by which the sellers would indemnify HCI and CSTC Holdings for any damages arising out of matters or liabilities identified in the environmental due diligence report.[8] The

---

[7] The July 9, 2015, draft also proposed to resolve issues relating to the postclosing bonus and equity participation plans of CSTC and the postclosing treatment of any excess real property.

[8] The draft also accepted CSTC's proposed addition of provisions addressing the postclosing bonus and equity participation plans and the postclosing treatment of excess real property, with minor changes.

[*9] environmental indemnification provision was the primary substantive addition made in the July 10 draft.

Three significant actions were taken on July 10. First, CSTC paid out employee bonuses totaling $6,102,862 pursuant to its newly amended Change in Control Bonus Plan. Second, CSTC submitted to the Michigan Department of Licensing and Regulatory Affairs an amendment to its Articles of Incorporation, signed by petitioner, which provided for actions requiring a shareholder meeting and vote to be taken upon written consent of the shareholders—a change requested by HCI. Third, Ms. Kanski forwarded to Mr. Bear the updated draft of the Minority Stock Purchase Agreement dated July 15 and asked Mr. Bear to forward it to Fidelity Charitable for signature; the next morning (Saturday, July 11), Mr. Bear forwarded the email from Fidelity Charitable to Messrs. Boland and Chisholm. In Ms. Kanski's initial email to Mr. Bear, Ms. Kanski noted that "the closing has been pushed back to Tuesday, at the earliest." Ms. Kanski also noted that "the definition of seller's representative will be revised from Scott to Clark Hill." The draft Minority Stock Purchase Agreement was dated July 13 and included a warranty that Fidelity Charitable "is the record and beneficial owner of and has good and valid title to the Shares, free and clear of any and all Liens."

At 4:38 a.m. on July 13, 2015, the Contribution and Stock Purchase Agreement underwent a redline comparison against the prior revised updated draft on behalf of HCI. This revised draft had already accepted the environmental liability provision into the text. The share contribution provision still did not specify the date on which petitioner transferred the shares to Fidelity Charitable. Later that morning, at 7:56 a.m., Mr. Bear once more emailed Mr. Boland to request signatures from Fidelity Charitable on the Minority Stock Purchase Agreement, as the parties were "hoping to close . . . the next day." At 9:08 a.m., Mr. Boland responded: "It is important that we receive the stock certificate before we reach a conclusion on the sale/redemption. Did the stock certificate go out yet?" At 9:13 a.m., Mr. Bear swiftly alerted Ms. Kanski to the problem, informing her that "Fidelity will not sign off on anything until they see the stock certificate. As far as they know, they don't have any shares to sell." At Mr. Bear's request, Ms. Kanski emailed him a PDF stock certificate, which Mr. Bear forwarded by email to Mr. Boland at 9:30 a.m. The stock certificate was numbered 1670, was signed by

**[\*10]** petitioner but undated, and stated that 1,380.40 shares of CSTC common stock were owned by Fidelity Charitable.[9]

At 1:21 p.m., counsel for HCI emailed counsel for CSTC, noting that "I know CSTC will be issuing a certificate to the Gift Fund" and asking whether "the transfer to the gift fund has occurred yet." At 3:24 p.m., counsel for CSTC responded that "[y]es, the transfer to the Gift Fund has occurred" and attached a printout spreadsheet that purported to list CSTC shareholders, numbers of shares held, and dates of issuance. The relevant page of the printout was dated July 13, 2015, and displayed a disposition entry for certificate No. 1654 with a date of "7/10/2015" and a note stating: "Cancelled: Scott transferred 1,380.50 Fidelity Investments."[10] The printout also displayed an issuance entry for certificate No. 1670 stating that 1,380 shares had been issued to Fidelity Charitable. At 5:22 p.m., Mr. Boland emailed Mr. Bear with an attached signature page, signed by Mr. Boland on behalf of Fidelity Charitable, for the Minority Stock Purchase Agreement. At 6:43 p.m., counsel for CSTC forwarded signature pages for a number of transaction-related documents, including the written consents by the board of CSTC, to petitioner and his two brothers requesting their signatures.

Early on the morning of July 14, Mr. Bear forwarded the signature pages from Fidelity Charitable to Ms. Kanski, who forwarded them to CSTC's counsel. Later that day, counsel for CSTC circulated a revised draft of the Contribution and Stock Purchase Agreement, which filled in the share contribution provision to specify that petitioner had transferred the shares on July 10, 2015. The final draft made minimal changes to the prior circulated drafts.[11] Additionally, on July 14, CSTC made a pro rata distribution, characterized as a dividend, of $4,796,352 to petitioner and his two brothers; Fidelity Charitable did not

---

[9] During the examination of petitioners' 2015 return, Ms. Kanski produced a copy of a stock certificate stamped "cancelled," which she received from petitioner that included an additional typewritten date field of June 11, 2015.

[10] The fractional amount of .50 appears to have been a clerical error.

[11] The primary change was a slight revision to a provision for payment of compensation to the retired brothers Mark and Kurt Hoensheid to cover the cost of their health insurance, specifying that compensation would terminate upon either (1) the retirees' becoming eligible for Medicare or (2) a defined liquidity event's occurring.

**[*11]** participate in the distribution. The distribution represented nearly all of the remaining cash within CSTC.

On July 15, HCI, CSTC Holdings, petitioner, and his two brothers executed signatures on a final Contribution and Stock Purchase Agreement, which was approved by CSTC's shareholders and board that same day. The final agreement included the share contribution provision, which specified that petitioner had transferred 1,380 shares to Fidelity Charitable on "July 10, 2015." The final agreement provided for petitioner and his two brothers to exchange shares in CSTC for shares in the new CSTC Holdings, in an amount sufficient to constitute 51% ownership of CSTC Holdings. HCI agreed to contribute cash to CSTC Holdings in exchange for shares in a number sufficient to constitute 49% ownership of the common stock of CSTC Holdings.[12] CSTC Holdings then agreed to purchase the remainder of the outstanding shares of CSTC owned by petitioner and his two brothers, as well as the 1,380 shares owned by Fidelity Charitable. On July 15, a representative from Clark Hill signed on behalf of Fidelity Charitable a document titled "Irrevocable Stock Power." The document represented that Fidelity Charitable "does hereby sell, assign and transfer" the 1,380 shares to CSTC Holdings. The document also stated that Fidelity Charitable "does hereby irrevocably constitute and appoint (blank space) as attorney to transfer the said stock on the books of the Corporation with full power of substitution in the premises." Fidelity Charitable received $2,941,966 in cash proceeds from the sale, which was deposited into petitioners' giving account.

At closing, petitioners received $21,330,818 in cash, 50,000 shares of CSTC Holdings common stock, and a subordinated promissory note of $5 million. In October 2015 petitioner and his two brothers received a postclosing distribution of excess working capital from CSTC totaling $1,093,878. Additionally, in August, October, and November 2016, petitioner and his two brothers received another distribution relating to CSTC's 2015 tax refunds.

IV.    *The Contribution Confirmation Letter, Tax Return, & Appraisal*

On November 18, 2015, Fidelity Charitable sent petitioners a contribution confirmation letter acknowledging a charitable

---

[12] The agreement also provided for HCI to receive shares of nonvoting convertible preferred stock in CSTC Holdings and a subordinated promissory note for $2 million.

[*12] contribution from them of 1,380.400 shares of CSTC stock.[13] The letter indicated, inter alia, that Fidelity Charitable received the shares of CSTC stock on June 11, 2015, and stated that "Fidelity Charitable has exclusive legal control over the contributed asset, and this contribution is irrevocable and cannot be refunded." The letter further stated that "Fidelity Charitable did not provide any goods or services in exchange for or in consideration of this contribution." Fidelity Charitable also provided petitioners with a yearend account statement, which reported a received date of June 11, 2015, for the shares of CSTC stock and stated that "[a]ny error must be reported to Fidelity Charitable within 60 days."

On November 30, 2015, petitioner emailed Ms. Kanski, asking: "What date did we donate the stock to Fidelity Charitable?" He stated that "FINNEA is playing dumb toward providing the appraisal and I have asked Plante Moran." Several minutes later, petitioner sent a subsequent email to Ms. Kanski: "I think I found it: 6/11/15," and copying text that appeared to be from Fidelity Charitable's documentation. On December 18, Ms. Kanski emailed petitioner to inform him that she had asked Mr. Hensien of Clark Hill "to light a fire under FINNEA regarding the appraisal."

Ms. Kanski supervised the preparation of petitioners' 2015 federal income tax return and signed the return as the preparer. The return was timely filed with the Internal Revenue Service (IRS) on April 14, 2016. Petitioners did not report any capital gains associated with the sale of the 1,380 shares and claimed a noncash charitable contribution deduction of $3,282,511.

Petitioners attached to their return a Form 8283, Noncash Charitable Contributions, reporting a contribution of $3,282,511 relating to the 1,380 shares of CSTC stock and a date of contribution of June 11, 2015. The declaration of appraiser section on the Form 8283

[13] On July 15, 2015, Fidelity Charitable apparently sent petitioners an initial contribution confirmation letter for the receipt of the shares of CSTC stock. By unsigned letter dated November 18, 2015, Fidelity Charitable informed petitioners that "[d]ue to an error made by one of our contribution representatives, a contribution confirmation dated July 15, 2015 was mailed to you noting the incorrect party for tax deduction purposes." That letter further stated that "[t]his error has now been corrected," that "a new confirmation letter has been mailed," and that petitioners "must disregard the contribution confirmation letter that was previously sent to you, dated July 15, 2015." Petitioners did not produce a copy of the initial, apparently erroneous, contribution confirmation letter.

[*13] was signed by Brian Dragon as appraiser, and the donee acknowledgment section was signed by a representative of Fidelity Charitable. Attached to the Form 8283 was a document entitled "CSTC Fidelity Gift Fund Valuation," which purported to be a qualified appraisal that Mr. Dragon prepared with respect to the "CSTC Fidelity Gift Fund." According to the appraisal, Mr. Dragon determined that the 1,380 shares of CSTC stock had a value of $3,282,511 as of June 11, 2015, which was $340,545 higher than the actual proceeds Fidelity Charitable received from the sale of those shares to HCI on July 15, 2015. The appraisal included a brief biography of Mr. Dragon (which did not address whether Mr. Dragon had appraisal experience or qualifications), a valuation summary, the Forms 8283 and 8282, Donee Information Return, and a number of transactional documents relating to the acquisition by HCI. The appraisal attached a final version of the Minority Stock Purchase Agreement, which included an amended clause appointing Clark Hill as seller's representative.

The valuation summary page included three columns with different valuation scenarios. Each valuation started with an enterprise value of $105 million (the total consideration per the Contribution and Stock Purchase Agreement) and then made various adjustments. The first scenario added to the value the amount of capital expenditure reimbursement and subtracted the amount of transaction fees (both of which were accounted for in the transaction with HCI) to arrive at a value of $103,118,311 and thus a proportional value of $2,941,966 (i.e., the actual amount of proceeds received by Fidelity Charitable). The second scenario also added to the value the amount of additional postclosing payments received by petitioner and his two brothers (but not Fidelity Charitable), which related to excess working capital and CSTC's tax refunds, and subtracted minor adjustments, to arrive at a value of $105,697,329 and thus a proportional value of $3,015,546. Finally, the third scenario also added to the value $9,357,335 of "Cash & Equivalents," to arrive at a value of $115,054,664 and thus a proportional value of $3,282,511 (i.e., the claimed appraisal value).

The appraisal report valued the CSTC stock as of June 11 but did not expressly disclose a date of contribution for the shares. The appraisal included a page that listed a number of traditional valuation approaches and quoted from a section of Rev. Rul. 59-60, 1959-1 C.B. 237, that discusses valuation of securities. On the following page the appraisal stated that FINNEA "elected not to contemplate the aforementioned traditional valuation methods in favor of the empirical valuation resulting from its thorough marketing efforts below." In the

[*14] space below, the appraisal contained the scope of services for which FINNEA had been engaged, copied from the text of its letter of engagement with CSTC. The appraisal did not further explain the empirical method used in the appraisal. Neither did it include a statement that it was prepared for federal income tax purposes.

Mr. Dragon had previously performed valuations on a limited basis, including one estate tax valuation, but had not previously prepared an appraisal substantiating a charitable contribution of shares in a closely held corporation. Mr. Dragon did not charge an additional fee for the appraisal in addition to what he and FINNEA had already received as fees in the transaction with HCI; nor did Mr. Dragon and petitioners execute a separate engagement letter for him to perform the appraisal. While petitioners received a quote from a national accounting firm, Plante Moran, to complete an appraisal, they ultimately decided to have Mr. Dragon prepare the report instead.

A Form 8282 was prepared for petitioners. Signed by a representative of Fidelity Charitable, it reported the receipt of petitioners' entire interest in 1,380.400 shares of CSTC stock on June 11, 2015. A representative of Fidelity Charitable later signed an amended Form 8282, which reflected the receipt of 1,380 shares of CSTC stock from petitioners, rather than 1,380.400.

V.      *The Examination & Notice of Deficiency*

By letter dated December 19, 2017, petitioners were informed that the Commissioner had selected their 2015 return for examination. Ms. Kanski represented petitioners during the examination. On December 6, 2018, John Copenhagen, an IRS group manager, electronically signed a Civil Penalty Approval Form approving the assessment of a penalty under section 6662 against petitioners. By letter dated December 6, 2018, respondent proposed to disallow in full petitioners' charitable contribution deduction and to assess a penalty under section 6662.

On October 9, 2019, respondent issued to petitioners a notice of deficiency, determining a deficiency of $647,489, resulting from the disallowance of the claimed charitable contribution deduction, and a penalty of $129,498 under section 6662(a).

Petitioner's timely Petition was filed on October 15, 2019. On December 16, 2019, respondent filed an Answer. Respondent's counsel received approval to request assessment of an additional penalty under

**[\*15]** section 6662(a) on February 19, 2020, in an email from, her immediate supervisor at the IRS Office of Chief Counsel. On August 25, 2020, respondent filed an amended Answer, asserting an increased deficiency and an increased section 6662(a) penalty, due to application of the anticipatory assignment of income doctrine.

## OPINION

In general, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Kearns v. Commissioner*, 979 F.2d 1176, 1178 (6th Cir. 1992), *aff'g* T.C. Memo. 1991-320. Moreover, deductions are a matter of legislative grace, and taxpayers must demonstrate their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). However, the Commissioner bears the burden of proof with respect to new matters or increases in deficiency pleaded in his answer. Rule 142(a)(1). In his amended Answer, respondent first asserted an increase in deficiency on the grounds that petitioners made an anticipatory assignment of income of their proceeds from the sale of CSTC shares to HCI. Consequently, the burden is on petitioners only with respect to (1) whether they made a valid gift of shares to Fidelity Charitable and (2) whether they are entitled to a charitable contribution deduction. Respondent bears the burden with respect to whether petitioners realized and recognized gains pursuant to the anticipatory assignment of income doctrine.

The burden of proof on factual issues may be shifted to the Commissioner if the taxpayer introduces "credible evidence" with respect thereto and satisfies recordkeeping and other requirements. *See* § 7491(a)(1) and (2). Petitioners have not sought to shift the burden with respect to any factual issue.

Gross income means "all income from whatever source derived," including "[g]ains derived from dealings in property." § 61(a)(3). In general, a taxpayer must realize and recognize gains on a sale or other disposition of appreciated property. *See* § 1001(a)–(c). However, a taxpayer typically does not recognize gain when disposing of appreciated property via gift or charitable contribution. *See Taft v. Bowers*, 278 U.S. 470, 482 (1929); *Guest v. Commissioner*, 77 T.C. 9, 21 (1981); *see also* § 1015(a) (providing for carryover basis of gifts). A taxpayer may also generally deduct the fair market value of property contributed to a qualified charitable organization. *See* § 170(a)(1); Treas. Reg.

**[*16]** § 1.170A-1(c)(1). Contributions of appreciated property are thus tax advantaged compared to cash contributions; when a contribution of property is structured properly, a taxpayer can both avoid paying tax on the unrealized appreciation in the property and deduct the property's fair market value. *See, e.g., Dickinson v. Commissioner*, T.C. Memo. 2020-128, at *5. The use of a donor-advised fund further optimizes a contribution by allowing a donor "to get an immediate tax deduction but defer the actual donation of the funds to individual charities until later." *Fairbairn v. Fid. Invs. Charitable Gift Fund*, No. 18-cv-04881, 2021 WL 754534, at *2 (N.D. Cal. Feb. 26, 2021).

We apply a two-part test when determining whether to respect the form of a charitable contribution of appreciated property followed by a sale by the donee. The donor must (1) give the appreciated property away absolutely and divest of title (2) "before the property gives rise to income by way of a sale." *Humacid Co. v. Commissioner*, 42 T.C. 894, 913 (1964). The first prong incorporates the section 170(c) requirement that the taxpayer make a valid gift[14] of property, *see Jones v. Commissioner*, 129 T.C. 146, 150 (2007), *aff'd*, 560 F.3d 1196 (10th Cir. 2009), while the second prong incorporates the anticipatory assignment of income doctrine, *see Dickinson*, T.C. Memo. 2020-128, at *8. Accordingly, we first must determine whether petitioners made a valid gift of the CSTC shares to Fidelity Charitable and, if so, on what date the gift was made. We must then determine the tax consequences, including eligibility for a charitable contribution deduction, of any gift by petitioners.

I. *Valid Gift of Shares of Stock*

"Ordinarily, a contribution is made at the time delivery is effected." Treas. Reg. § 1.170A-1(b). The regulations further provide that "[i]f a taxpayer unconditionally delivers or mails a properly endorsed stock certificate to a charitable donee or the donee's agent, the gift is completed on the date of delivery."[15] *Id.* However, the regulations do not define what constitutes delivery. *See, e.g., Dyer v. Commissioner*,

---

[14] We use the term "gift" synonymously here with the term "charitable contribution." *See Seed v. Commissioner*, 57 T.C. 265, 275 (1971).

[15] The regulations alternatively provide, in relevant part, that "[i]f the donor delivers the stock certificate to his bank or broker as the donor's agent, or to the issuing corporation or its agent, for transfer into the name of the donee, the gift is completed on the date the stock is transferred on the books of the corporation." Treas. Reg. § 1.170A-1(b).

**[\*17]** T.C. Memo. 1990-51, 58 T.C.M. (CCH) 1321, 1323; *Brotzler v. Commissioner*, T.C. Memo. 1982-615, 44 T.C.M. (CCH) 1478, 1480; *Alioto v. Commissioner*, T.C. Memo. 1980-360, 40 T.C.M. (CCH) 1147, 1154, *aff'd*, 692 F.2d 762 (9th Cir. 1982). Accordingly, we must first look to state law for the threshold determination of whether petitioners divested themselves of their property rights via gift.[16] *See United States v. Nat'l Bank of Com.*, 472 U.S. 713, 722 (1985) (concluding that state law determines property rights and federal law classifies them for appropriate tax treatment); *Jones*, 129 T.C. at 150 ("In order to make a valid gift for Federal tax purposes, a transfer must at least effect a valid gift under the applicable State law."); *Greer v. Commissioner*, 70 T.C. 294, 304 (1978) (applying state gift law requirements to charitable contribution of property), *aff'd on another issue*, 634 F.2d 1044 (6th Cir. 1980); *Kissling v. Commissioner*, T.C. Memo. 2020-153, at \*22 ("Whether delivery is effected is a question of state law."). In doing so, we apply state law in the manner in which the highest court of the state has indicated that it would apply the law. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967). Where the state's highest court is silent, we must discern and apply the state law, giving "proper regard" to the state's lower courts. *See Julia R. Swords Tr. v. Commissioner*, 142 T.C. 317, 342 (2014) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. at 465).

As to the choice of state law, both parties focused their state law briefing on Michigan law, and we cannot discern a choice of law principle that would suggest the parties' understanding is incorrect. Accordingly, we apply the law of the state of petitioners' domicile, Michigan, with respect to whether and when petitioners made a valid gift of the CSTC shares. *See Macatawa Bank v. Wipperfurth*, 822 N.W.2d 237, 238 (Mich. Ct. App. 2011) ("The longstanding rule in Michigan is that 'the situs of intangible assets is the domicile of the owner unless fixed by some positive law.'" (quoting *Brown v. O'Donnell (In re Rapoport's Est.)*, 26 N.W.2d 777, 781 (Mich. 1947))); *see also Malkan v. Commissioner*, 54

---

[16] This Court has at times applied its own longstanding test for a valid inter vivos gift. *See Guest*, 77 T.C. at 16 (quoting *Weil v. Commissioner*, 31 B.T.A. 899, 906 (1934), *aff'd*, 82 F.2d 561 (5th Cir. 1936)). This test, while more extensive on its face than what is required under Michigan law, shares the same core elements: "donative intent, delivery by the donor and acceptance by the donee." *Goldstein v. Commissioner*, 89 T.C. 535, 542 (1987) (distilling the *Weil* test); *see Estate of Sommers v. Commissioner*, T.C. Memo. 2013-8, at \*43 n.20 (analyzing validity of gift under principles consistent with both federal and state law); *Estate of Dubois v. Commissioner*, T.C. Memo. 1994-210, 1994 WL 184393, at \*2 (reaching conclusion that no valid gift was made under both federal and state law).

**[\*18]** T.C. 1305, 1314 n.3 (1970) (applying law of the situs to determine validity of gift of shares of stock).

In determining the validity of a gift, Michigan law requires a showing of (1) donor intent to make a gift; (2) actual or constructive delivery of the subject matter of the gift; and (3) donee acceptance.[17] *See Davidson v. Bugbee*, 575 N.W.2d 574, 576 (Mich. Ct. App. 1997) (citing *Molenda v. Simonson*, 11 N.W.2d 835, 836 (Mich. 1943)); *see also United States v. Four Hundred Seventy Seven (477) Firearms*, 698 F. Supp. 2d 894, 902 (E.D. Mich. 2010) (applying Michigan law).

Petitioners and respondent each advance different dates for when petitioners made a gift to Fidelity Charitable of the CSTC shares. Petitioners argue that a gift was made on June 11, 2015, and they point to petitioner's testimony and Fidelity Charitable's corrected contribution confirmation letter, which both claim June 11 as the date of the gift. Respondent argues that a valid gift was not made until at least July 13, 2015, when Fidelity Charitable first received a stock certificate from petitioners' representatives.[18] We will examine each of three required elements for a valid gift in turn.

---

[17] Petitioners alternatively direct us to Article 8 of the Uniform Commercial Code (UCC), as adopted by Michigan, which on its face is applicable to gift transfers of certificated securities. *See* Mich. Comp. Laws § 440.1201(2)(cc) (2015) ("'Purchase' means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, *gift*, or any other voluntary transaction creating an interest in property." (Emphasis added.)); *id.* (dd); *id.* § 440.8301(1)(a) and (b) (delivery of certificated security occurs when purchaser or third party acting on their behalf "acquires possession of the security certificate"). While the Michigan Supreme Court does not appear to have expressly addressed the issue, we do not read the UCC provisions as disturbing the longstanding Michigan common law test. *See id.* § 440.8302 cmt. 2 ("Article 8 does not determine whether a property interest in certificated or uncertificated security is acquired under other law, such as the law of gifts, trusts, or equitable remedies."); *id.* § 440.1103(2) (stating that "principles of law and equity" supplement UCC provisions); *see also Young v. Young*, 393 S.E.2d 398, 401 (Va. 1990) ("The common law requirements of delivery and acceptance are not removed by those provisions of the [UCC] pertaining to the transfer of securities.").

[18] Respondent raises a separate issue with regard to the dividend paid out by CSTC on July 14 to petitioner and the two brothers, but not paid to Fidelity Charitable, speculating that petitioners did not make a valid gift of the shares. Respondent's contention appears to be foreclosed by Michigan law, which provides that retention of a dividend does not preclude a valid gift of the underlying shares. *See Cook v. Fraser*, 299 N.W. 113, 114 (Mich. 1941) (citing *Ford v. Ford*, 259 N.W. 138 (Mich. 1935)); *In re Estate of Prinstein*, No. 252682, 2005 WL 1459575, at \*1 (Mich. Ct. App. June 21, 2005) ("[T]he fact that a donor collects dividends on a security does not make an inter-vivos gift of that security invalid.").

**[\*19]**  A.    *Present Intent*

The determination of a party's subjective intent at some historical point is necessarily a highly fact-bound issue.  When deciding such an issue, we must determine "whether a witness's testimony is credible based on objective facts, the reasonableness of the testimony, the consistency of statements made by the witness, and the demeanor of the witness." *Ebert v. Commissioner*, T.C. Memo. 2015-5, at \*5–6*; see also Estate of Kluener v. Commissioner*, 154 F.3d 630, 636 (6th Cir. 1998), *aff'g in relevant part* T.C. Memo. 1996-519.  If contradicted by the objective facts in the record, we will not "accept the self-serving testimony of [the taxpayer] . . . as gospel." *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986); *see Davis v. Commissioner*, 88 T.C. 122, 143 (1987), *aff'd*, 866 F.2d 852 (6th Cir. 1989).

We start with petitioner's contemporaneous emails and the contemporaneous transactional documents, which we consider to be especially probative evidence with respect to his intent.  On June 1, petitioner first expressed in an email that he wanted to wait to make the gift of the shares to Fidelity Charitable until the last possible moment, when he was "99% sure" that the sale to HCI would close.  Petitioner's subsequent actions and communications were consistent with that intent.  On June 11, petitioner and his two brothers executed the Consent to Assignment agreement, an act that demonstrated petitioner's generalized future intent to make a gift.  However, the Consent to Assignment cannot establish that, as of June 11, such an intent was sufficiently present and specific.  *See Czarski v. Bonk*, 124 F.3d 197, 1997 WL 535773, at \*4 (6th Cir. 1997) (unpublished table decision) (applying Michigan law and finding no evidence establishing purported donor's "specific intent" with respect to the particular property).  On its face, the Consent to Assignment agreement failed to specify a number of shares to be contributed, suggesting that petitioner had not yet decided that key detail.  Similarly, the original stock certificate, which was prepared on or sometime after June 11, failed to specify an effective date, again suggesting that a date would be decided upon later.[19]  On July 6, petitioner stated in an email that he was still

---

[19] We note that copies of the Consent to Assignment agreement and stock certificate that were produced to the Commissioner during the examination appear to have been modified and backdated to specify, respectively, a number of shares and an effective date that were not originally present at the time of the transaction.  We find such inconsistencies to be significant in evaluating petitioners' claim that the gift was made on June 11.  *Cf. Ferguson v. Commissioner*, 174 F.3d 997, 1000 (9th Cir. 1999)

[*20] "not totally sure of the shares being transferred to the charitable fund yet." That email confirms that, as of July 6, the details of the contribution were still in flux. Indeed, three days later, on July 9, Mr. Bear emailed Mr. Boland to inform him that "it looks like Scott has arrived at 1380 shares."

At trial, petitioner testified that he believed the number of shares to be donated was set at 1,380 on June 11. That testimony is squarely contradicted by the Consent to Assignment agreement, petitioner's July 6 email, and Mr. Bear's July 9 email. *See, e.g.*, *Richardson v. Commissioner*, T.C. Memo. 1984-595, 49 T.C.M. (CCH) 67, 73–74 (concluding that taxpayer's characterization of date of contribution was not credible where in conflict with "documents written contemporaneously with the donation"). Petitioner also testified that his July 6 email was referring to a potential donation of a second tranche of shares, a theoretical event which apparently never took place. The record contains no evidence supporting the claim that petitioners attempted to make (or even contemplated) two separate gifts of CSTC shares. We find petitioner's self-serving testimony as to his intent to be incredible.

The record does not support a finding of present intent to make a gift until July 9 when petitioner settled on a number of 1,380 shares. From that point on, petitioner took a number of actions that confirmed his present intent to transfer. On July 9 or 10 petitioner delivered the physical stock certificate to Ms. Kanski's office. Similarly, on July 10 petitioner created an online giving account with Fidelity Charitable. Taken together, these actions provide sufficient credible evidence of petitioner's intent. We conclude that, as of July 9, petitioner had present intent to make a gift.

B.     *Delivery*

At bottom, the delivery requirement generally contemplates an "open and visible change of possession" of the donated property. *Shepard v. Shepard*, 129 N.W. 201, 208 (Mich. 1910); *Davis v. Zimmerman*, 40 Mich. 24, 27 (1879). As the term itself suggests, manually providing tangible property to the donee is the classic form of delivery. *See, e.g.*, Restatement (Second) of Property § 31.1 cmt. b (Am. L. Inst. 1992) (describing the "simplest" form of delivery as the donor's

(questioning purported date of contribution where "the original handwritten date in a printed box entitled 'date of donation' . . . had been completely scratched out" and a new date written next to it), *aff'g* 108 T.C. 244 (1997).

**[\*21]** "plac[ing] the subject matter of the gift in the hands of the intended donee"). Similarly, manually providing to the donee a stock certificate that represents intangible shares of stock is traditionally sufficient delivery. *See* Philip Mechem, *Gifts of Corporation Shares*, 20 Ill. L. Rev. 9, 15–16 (1925–1926) (collecting cases). However, the determination of what constitutes delivery is inherently context-specific and depends upon the "nature of the subject-matter of the gift" and the "situation and circumstances of the parties." *Shepard*, 129 N.W. at 208 ("[N]o absolute rule can be laid down as to what will constitute a sufficient delivery . . . .").

Delivery need not necessarily be actual. Constructive delivery may be effected where property is delivered into the possession of another on behalf of the donee. *See, e.g.*, *In re Van Wormer's Estate*, 238 N.W. 210, 212 (Mich. 1931) (finding constructive delivery where stock certificate was issued in the name of donee and deposited at bank). Whether constructive or actual, delivery "must be unconditional and must place the property within the dominion and control of the donee" and "beyond the power of recall by the donor." *In re Casey Estate*, 856 N.W.2d 556, 563 (Mich. Ct. App. 2014) (citing *Osius v. Dingell*, 134 N.W.2d 657, 659 (Mich. 1965)); *see Geisel v. Burg*, 276 N.W. 904, 908 (Mich. 1937) (finding no valid gift where certificates of deposit were never placed beyond donor's control). If constructive or actual delivery of the gift property occurs, its later retention by the donor is not sufficient to defeat the gift. *See Estate of Morris v. Morris*, No. 336304, 2018 WL 2024582, at \*5 (Mich. Ct. App. May 1, 2018) (citing *Jackman v. Jackman*, 260 N.W. 769, 770 (Mich. 1935)); *see also Garrison v. Union Tr. Co.*, 129 N.W. 691, 692 (Mich. 1911).

With respect to delivery, neither Mr. Hoensheid nor Ms. Kanski was able to credibly identify a specific action taken on June 11 that placed the shares within Fidelity Charitable's dominion and control.[20] *See Czarski*, 1997 WL 535773, at \*4 (finding no evidence that donor took any action that would constitute delivery or place gift property in donee's dominion and control); *see also Reed Smith Shaw & McClay v. Commissioner*, T.C. Memo. 1998-64, 1998 WL 62393, at \*8 (declining to credit uncorroborated self-serving testimony regarding actions

---

[20] In his testimony, petitioner implied a belief that the execution of the Consent to Assignment agreement had effected a transfer. Execution of the Consent to Assignment agreement did not purport to transfer ownership of any portion of petitioner's shares; instead, it merely allowed him the ability to transfer shares in the future.

[*22] purportedly taken to effect transfer of shares to trust). Instead, petitioner's and Ms. Kanski's trial testimony suggested that the physical, partially completed stock certificate remained on petitioner's desk until July 9 or 10, 2015, at which point it was dropped off at Ms. Kanski's office. Consequently, delivery to Fidelity Charitable could not have taken place before July 9 or 10, because petitioner retained dominion and control of the shares while the physical certificate was sitting on his desk. *Cf. In re Casey Estate*, 856 N.W.2d at 563 (finding no delivery where donor retained property in his safe and could thus change the combination at any time to preclude access by purported donee).

The same principle is applicable to the three or four days when the physical certificate was in Ms. Kanski's office, before the forwarding of the PDF share certificate to Fidelity Charitable. The Minority Stock Purchase Agreement's seller representative clause, as executed, named Ms. Kanski's firm, Clark Hill, as the seller's representative of Fidelity Charitable. That designation raises the question of whether Ms. Kanski's possession of the certificate constituted delivery to Fidelity Charitable. However, we cannot conclude that providing the certificate to Ms. Kanski removed the shares from petitioner's power of recall. Petitioners have not provided any evidence to indicate that Ms. Kanski could have disregarded an instruction from petitioner—her client—to return or simply discard the stock certificate before July 13. *See Osius*, 134 N.W.2d at 656 (stating that a valid gift "must invest ownership in the donee beyond the power of recall by the donor"); *Snyder v. Snyder*, 92 N.W. 353, 354 (Mich. 1902) ("The retaining of any control in the hands of the donor over the subject of the gift renders it invalid."); *see also Londen v. Commissioner*, 45 T.C. 106, 109 (1965) (finding it "unlikely" that corporation's secretary "would have refused to honor a countermand of the transfer instructions issued by [the taxpayer]"); *Morrison v. Commissioner*, T.C. Memo. 1987-112, 53 T.C.M. (CCH) 251, 255 (finding no evidence that if taxpayer had "countermanded her instructions to transfer the stock, [her broker] would have refused to halt the transfer"). Thus, we conclude that the stock certificate, while in the possession of Ms. Kanski, was subject to recall by petitioner at any time and was not within the dominion and control of Fidelity Charitable, precluding delivery. *See Londen*, 45 T.C. at 109; *Zipp v. Commissioner*, 28 T.C. 314, 324–25 (1957) (finding retention of stock certificates by donor's attorney to preclude a valid gift), *aff'd*, 259 F.2d 119 (6th Cir. 1958); *Bucholz v. Commissioner*, 13 T.C. 201, 204 (1949) (finding no valid gift where taxpayer instructed custodian of corporate

**[\*23]** books to prepare stock certificates but remained undecided about ultimate gift).

In some jurisdictions, transfer of shares on the books of the corporation can, in certain circumstances, constitute delivery of an inter vivos gift of shares. *See, e.g., Wilmington Tr. Co. v. Gen. Motors Corp.*, 51 A.2d 584, 594 (Del. Ch. 1947); *Chi. Title & Tr. Co. v. Ward*, 163 N.E. 319, 322 (Ill. 1928); *Brewster v. Brewster*, 114 A.2d 53, 57 (Md. 1955). However, the Michigan Supreme Court does not appear to have addressed whether transfer on the books of a corporation alone can constitute delivery of a valid gift of certificated shares of stock. In several older tax cases, the U.S. Court of Appeals for the Sixth Circuit—to which an appeal in this case would lie, absent stipulation to the contrary—has stated that transfer on the books of a corporation constitutes delivery of shares of stock, apparently as a matter of federal common law. *See Lawton v. Commissioner*, 164 F.2d 380, 384 (6th Cir. 1947), *rev'g* 6 T.C. 1093 (1946); *Bardach v. Commissioner*, 90 F.2d 323, 326 (6th Cir. 1937), *rev'g* 32 B.T.A. 517 (1935); *Marshall v. Commissioner*, 57 F.2d 633, 634 (6th Cir. 1932), *aff'g in part, rev'g in part* 19 B.T.A. 1260 (1930). We have previously observed that, in this line of cases, the transfers on the books of the corporation were bolstered by other objective actions that evidenced a change in possession and thus a gift. *See Jolly's Motor Livery Co. v. Commissioner*, T.C. Memo. 1957-231, 16 T.C.M. (CCH) 1048, 1073 (distinguishing *Bardach* and *Marshall* and instead concluding that taxpayer failed to make a valid gift under Tennessee law); *see also Bucholz*, 13 T.C. at 204; *Campbell v. Commissioner*, T.C. Memo. 1979-411, 39 T.C.M. (CCH) 287, 289. We would thus be hesitant to conclude that transfer on the books of CSTC would be sufficient here as a matter of law, given the apparent split of authorities on the issue and lack of state law precedent. *See Fletcher Cyclopedia of the Law of Corporations* § 5684 (West 2022) ("Generally, a transfer of stock from the donor to the donee on the corporate books, standing alone, is not sufficient to constitute a valid gift, at least with regard to a close corporation where the donor is in control[.]"); Mark S. Rhodes, *Transfer of Stock* § 6:3 (7th ed. 2021) ("There is a division of authority as to whether a mere transfer on the books of the corporation without delivery of the certificate constitutes a valid gift of stock."); Mechem, *Gifts of Corporation Shares*, *supra*, at 25–26 (describing view that transfer on the books of the corporation effects only the relationship between new shareholder and corporation, while delivery of certificate separately transfers ownership of shares as property between persons).

**[\*24]** However, even assuming arguendo that a transfer on the corporate books is sufficient to constitute delivery of certificated shares of stock in Michigan, we are still unable to find on the record before us that such a transfer occurred. The primary relevant evidence produced by petitioners is the printout of a purported stock ledger. The printout, which has a report date of July 13, shows an entry issuing 1,380 shares to Fidelity Charitable on July 10. At trial, however, petitioner testified that the printout was not from CSTC's official stock ledger but appeared to him instead to have been prepared by one of CSTC's attorneys. Indeed, petitioners themselves have at no point asserted that a gift occurred on July 10 and have not produced any evidence to corroborate such a transfer on the books of CSTC. We thus attribute little weight to the printout, given petitioners' failure to corroborate it with credible evidence. *See Sellers v. Commissioner*, T.C. Memo. 1977-70, 36 T.C.M. (CCH) 305, 312 (observing that self-serving corporate records are relevant evidence but "the weight to be accorded them is dependent upon their completeness and credibility"), *aff'd*, 592 F.2d 227 (4th Cir. 1979). Consequently, the record is insufficient to support a conclusion that delivery of the shares was made on July 10 via transfer on the books of CSTC.

Finally, we look to Mr. Bear's July 13 email of the PDF stock certificate to Fidelity Charitable. That email provides the strongest documentary evidence of the shares' leaving petitioner's dominion and control. Providing Fidelity Charitable with a copy of a stock certificate issued in its name was an objective act evidencing an "open and visible change of possession." *Shepard*, 129 N.W. at 208. Further, we find that this act placed the shares of CSTC in Fidelity Charitable's dominion and control, by providing Fidelity Charitable with an instrument that it could present to CSTC and exercise its rights as shareholder. Nor did any postdelivery retention by petitioner of a stock certificate render delivery ineffectual. *See id.* (stating that donor's postdelivery retention of stock certificates was "immaterial" to validity of gift). On the basis of the foregoing, we conclude that delivery of the shares of CSTC did not occur before July 13.

C. *Acceptance*

Donee acceptance of a gift is generally "presumed if the gift is beneficial to the donee." *Davidson*, 575 N.W.2d at 576; *see Osius*, 134 N.W.2d at 660; *Dunlap v. Dunlap*, 53 N.W. 788, 790 (Mich. 1892) ("The donation being for [the donees'] advantage, they will be deemed to have accepted it, unless the contrary appears."). Petitioners seek to reinforce

**[\*25]** that presumption by relying on the corrected contribution confirmation letter and yearend account statement from Fidelity Charitable, both of which stated that the shares were contributed (and thus presumably accepted by Fidelity Charitable) on June 11. Both Fidelity Charitable's guidelines and the yearend account statement note that donors are able to request corrections of both contribution confirmation letters and account statements. Petitioners did not produce a copy of the original contribution confirmation letter, dated July 15, 2015, that they received from Fidelity Charitable. Such evidence could have confirmed whether Fidelity Charitable consistently understood the date of contribution to be June 11 and what errors were present in the original letter. Petitioners' failure to produce such evidence within their control gives rise to a presumption that it would be unfavorable to their case. *See Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947). Given our conclusions above that neither the present intent nor the delivery requirement was met on June 11, we do not consider the corrected documentation from Fidelity Charitable to be reliable evidence with respect to the date of acceptance.

In contrast, Mr. Boland's July 13 email is the more convincing evidence and rebuts any presumption that acceptance took place on an earlier date. In that email Mr. Boland represented that he would need the stock certificate before he could take action with respect to the sale of shares to HCI. As Mr. Boland later testified, Fidelity Charitable typically required receipt of a stock certificate as a precondition to its acceptance of a gift when dealing with a contribution of closely held, certificated securities. Later on July 13, after receiving the stock certificate, Mr. Boland on behalf of Fidelity Charitable executed the Minority Stock Purchase Agreement under warranty of good title. That act is sufficient to establish acceptance by Fidelity Charitable. We conclude that acceptance occurred on July 13.

D. *Conclusion*

Petitioners have failed to establish that any of the elements of a valid gift was present on June 11, 2015. Instead, as a matter of state law, we find that petitioners made a valid gift of CSTC shares by effecting delivery on July 13. We thus conclude that petitioners divested themselves of title to the shares on July 13. *See Humacid Co.*, 42 T.C. at 913.

**[\*26]** II.    *Anticipatory Assignment of Income*

The anticipatory assignment of income doctrine is a longstanding "first principle of income taxation." *Commissioner v. Banks*, 543 U.S. 426, 434 (2005) (quoting *Commissioner v. Culbertson*, 337 U.S. 733, 739–40 (1949)).  The doctrine recognizes that income is taxed "to those who earn or otherwise create the right to receive it," *Helvering v. Horst*, 311 U.S. 112, 119 (1940), and that tax cannot be avoided "by anticipatory arrangements and contracts however skillfully devised," *Lucas v. Earl*, 281 U.S. 111, 115 (1930).  A person with a fixed right to receive income from property thus cannot avoid taxation by arranging for another to gratuitously take title before the income is received.  *See Helvering v. Horst*, 311 U.S. at 115–17; *Ferguson*, 108 T.C. at 259.  This principle is applicable, for instance, where a taxpayer gratuitously assigns wage income that the taxpayer has earned but not yet received, *see Lucas v. Earl*, 281 U.S. at 114–15, or gratuitously transfers a debt instrument carrying accrued but unpaid interest, *see Austin v. Commissioner*, 161 F.2d 666, 668 (6th Cir. 1947), *aff'g* 6 T.C. 593 (1946).

We deem the donor to have effectively realized income and then assigned that income to another when the donor has an already fixed or vested right to the unpaid income.  *See Cold Metal Process Co. v. Commissioner*, 247 F.2d 864, 872–73 (6th Cir. 1957) (focusing on whether right to future income from assigned property was contingent or vested at the time of assignment), *rev'g* 25 T.C. 1333 (1956); *Estate of Applestein v. Commissioner*, 80 T.C. 331, 342 (1983); *Friedman v. Commissioner*, 41 T.C. 428, 435 (1963) (describing doctrine as focused on "whether the income had been earned so that the right to payment at a future date existed when the gift was made"), *aff'd*, 346 F.2d 506 (6th Cir. 1965).  The same principle is often applicable where a taxpayer gratuitously transfers shares of stock that are subject to a pending, pre-negotiated transaction and thus carry a fixed right to proceeds of the transaction.  *See Ferguson*, 108 T.C. at 259; *Rollins v. United States*, 302 F. Supp. 812, 817–18 (W.D. Tex. 1969); *see also Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945) ("A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title.").

In determining whether an anticipatory assignment of income has occurred with respect to a gift of shares of stock, we look to the realities and substance of the underlying transaction, rather than to formalities or hypothetical possibilities.  *See Jones v. United States*, 531 F.2d 1343, 1345 (6th Cir. 1976) (en banc); *Allen v. Commissioner*, 66 T.C.

**[\*27]** 340, 346 (1976) (adopting *Jones*'s approach); *see also Cook v. Commissioner*, 5 T.C. 908, 911 (1945). In general, a donor's right to income from shares of stock is fixed if a transaction involving those shares has become "practically certain to occur" by the time of the gift, "despite the remote and hypothetical possibility of abandonment." *Jones*, 531 F.2d at 1346. In contrast, "[t]he mere anticipation or expectation of income" at the time of the gift does not establish that a donor's right to income is fixed. *Ferguson*, 108 T.C. at 257; *see S.C. Johnson & Son, Inc. v. Commissioner*, 63 T.C. 778, 785 (1975) (rejecting Commissioner's argument that right to income was fixed when there was only a "reasonable probability" of income from appreciated property).

As a preliminary matter, petitioners seek to rely on our recent nonprecedential decision in *Dickinson*, T.C. Memo. 2020-128. There, the taxpayer made several contributions to Fidelity Charitable of shares in a privately held corporation of which he was the chief financial officer. *Id.* at \*2–3. On each occasion, the taxpayer's contributions to Fidelity Charitable were shortly followed by redemptions of those shares by the corporation. *Id.* at \*3. Applying the *Humacid* test, we looked to whether the redemption "was practically certain to occur at the time of the gift" and "would have occurred whether the shareholder made the gift or not." *Id.* at \*8. We determined to respect the form of the transaction, because the redemption "was not a fait accompli at the time of the gift" and thus the taxpayer "did not avoid receipt of redemption proceeds" by contributing his shares. *Id.* at \*9.

In reaching this holding, we found it evident from the record in *Dickinson* that the redemptions would not have occurred but for the taxpayer's charitable contributions; thus there could be no "practically certain to occur" realization event for the taxpayer to avoid at the time of the gift. *Id.* This point is the key distinguishing factor between *Dickinson* and petitioners' case. Here, the record establishes that petitioners' charitable contribution would not have been made but for the impending sale to HCI. Unlike in *Dickinson*, the timing of the sale and petitioners' gift raises a question as to whether at the time of gift the sale was virtually certain to occur. Thus, *Dickinson*'s rationale does not avail petitioners.

We must also initially address the role of the Commissioner's prior issued guidance, which petitioners have raised. In *Rauenhorst v. Commissioner*, 119 T.C. 157, 173 (2002), we held that, "[u]nder the circumstances" of that case, the Commissioner was bound not to argue

[*28] against his own subregulatory guidance, as expressed in Rev. Rul. 78-197, 1978-1 C.B. 83.[21]  In *Rauenhorst*, we treated Rev. Rul. 78-197 as a binding concession by the Commissioner that precluded him from relying in that case on factors other than the donee's obligation to sell contributed property in his anticipatory assignment argument.

However, we also recognized in *Rauenhorst*, 119 T.C. at 171, the axiom that "revenue rulings are not binding on this Court, or other Federal courts."  *See Dickinson*, T.C. Memo. 2020-128, at *10 ("This Court has not adopted Rev. Rul. 78-197 as the test for resolving anticipatory assignment of income issues and does not do so today." (citations omitted)).  For a taxpayer to rely on a revenue ruling, the facts of the taxpayer's transaction must be "substantially the same as those considered in the revenue ruling."  *Barnes Grp., Inc. v. Commissioner*, T.C. Memo. 2013-109, at *37–38, *aff'd*, 593 F. App'x 7 (2d Cir. 2014); *see Syzygy Ins. Co. v. Commissioner*, T.C. Memo. 2019-34, at *47–48; *see also* Statement of Procedural Rules, 26 C.F.R. § 601.601(d)(2)(v)(*a*), (*e*). On the particular facts of this case, we do not find respondent's arguments to be sufficiently contrary to Rev. Rul. 78-197 to constitute a disavowal of his published guidance.  *See* Rev. Rul. 78-197, 1978-1 C.B. at 83 (describing its application as only to "proceeds of a redemption of stock under facts similar to those in *Palmer*"); *cf. Rauenhorst*, 119 T.C. at 182–83 (focusing on Commissioner's argument that courts are not bound by revenue rulings and his reliance on a case[22] that had been distinguished by the Commissioner in a prior private letter ruling).

While we consider a donee's legal obligation to sell as "significant to the assignment of income analysis," *Ferguson*, 108 T.C. at 259, it "is only one factor to be considered in ascertaining the 'realities and substance' of the transaction," *Allen*, 66 T.C. at 348 (quoting *Jones*, 531 F.2d at 1345).  Instead, "the ultimate question is whether the transferor, considering the reality and substance of all the circumstances, had a fixed right to income in the property at the time of transfer."  *Ferguson*,

---

[21] In Rev. Rul. 78-197, 1978-1 C.B. at 83, in the wake of our decision in *Palmer v. Commissioner*, 62 T.C. 684 (1974), *aff'd on other issue*, 523 F.2d 1308 (8th Cir. 1975), the Commissioner advised that, "under facts similar to those in *Palmer*," he would treat a charitable contribution of stock followed by a redemption as an anticipatory assignment of income "only if the donee is legally bound, or can be compelled by the corporation, to surrender the shares for redemption."  *Palmer* involved a taxpayer's contribution of shares of stock in his controlled corporation to a charitable foundation of which he was a trustee, followed by a redemption of the shares by the corporation.

[22] *Blake v. Commissioner*, 697 F.2d 473, 480–81 (2d Cir. 1982) (declining to rely on Rev. Rul. 78-197), *aff'g* T.C. Memo. 1981-579.

**[\*29]** 108 T.C. at 259; *see Dickinson*, T.C. Memo. 2020-128, at \*10. We thus look to several other factors that bear upon whether the sale of shares was virtually certain to occur at the time of petitioners' gift. In this case the relevant factors include (1) any legal obligation to sell by the donee, (2) the actions already taken by the parties to effect the transaction, *see Ferguson*, 106 T.C. at 264, (3) the remaining unresolved transactional contingencies, *see Robert L. Peterson Irrevocable Tr. #2 v. Commissioner*, T.C. Memo. 1986-267, 51 T.C.M. (CCH) 1300, 1316, *aff'd sub nom. Peterson v. Commissioner*, 822 F.2d 1093 (8th Cir. 1987), and (4) the status of the corporate formalities required to finalize the transaction, *see Estate of Applestein*, 80 T.C. at 345–46.

### A. *Fidelity Charitable's Obligation to Sell*

We turn first to whether Fidelity Charitable did in fact have an obligation to sell the CSTC shares. We conclude that respondent has not established that Fidelity Charitable had any legal obligation to sell the shares.[23] As petitioners point out, the terms and conditions of Fidelity Charitable's Letter of Understanding expressly disclaimed any such obligation. In addition, respondent has not sufficiently established the existence of any informal, prearranged understanding between petitioners and Fidelity Charitable that might otherwise constitute an obligation. *See Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994); *see also Chrem*, T.C. Memo. 2018-164, at \*13. This factor weighs against an anticipatory assignment of income but is not dispositive. *See Ferguson*, 108 T.C. at 259.

---

[23] In *Chrem v. Commissioner*, T.C. Memo. 2018-164, we suggested that a donor-advised fund's sponsoring organization may be subject to fiduciary duties that might impose a legal obligation to sell contributed shares constituting a small minority interest in a closely held corporation. *Id.* at \*15 ("If it refused to tender its shares and the entire transaction were scuttled, [the sponsoring organization] would apparently be left holding a 13% minority interest in a closely held Hong Kong corporation, the market value of which might be questionable."); *see also Grove v. Commissioner*, 490 F.2d 241, 248 (2d Cir. 1973) (Oakes, J. dissenting) (looking to New York trust law and observing that offering donated shares for redemption was "the only practice which a university treasurer could correctly take and still meet his own statutory obligations as a fiduciary"), *aff'g* T.C. Memo. 1972-98. Respondent did not present arguments or testimony as to what, if any, fiduciary duties Fidelity Charitable might have owed that would compel it to sell the CSTC shares to HCI. Accordingly, lacking the benefit of meaningful briefing on the subject, we cannot find that Fidelity Charitable was in fact legally obligated to sell the contributed shares by way of fiduciary duty.

[*30] B.    *Bonuses & Shareholder Distributions*

Next, we look to what acts CSTC and HCI took to effect the transaction before the July 13, 2015, gift.  As of that date, a number of acts had already taken place that may suggest the transaction was a virtual certainty.  One week before the gift, HCI had caused the incorporation of a new holding company subsidiary to acquire the CSTC shares.  Three days before the gift, CSTC had amended its Articles of Incorporation to allow for written shareholder consent, an action requested by HCI.  Most significantly, however, the "cash sweeping" actions taken by CSTC strongly suggest that the transaction with HCI was a virtual certainty before the gift on July 13.

On July 7, 2015 petitioner amended CSTC's Change in Control Bonus Plan in order to specify that CSTC "desire [sic] that the consummation of the Investment Transaction result in payments to eligible Grantees under the Plan."  That same day, petitioner stated in an email that CSTC would "sweep the cash from the company prior to closing and distribute it to the brothers."  As of July 7, CSTC and petitioner thus considered the transaction with HCI so certain to occur that they took action to trigger the bonus payouts, consistent with the plan to sweep CSTC's cash before closing.  On July 10, 2015, CSTC then paid out approximately $6.1 million in employee bonuses and, a few days later on July 14, distributed approximately $4.7 million to petitioner and his two brothers as shareholders.  While the July 14 distribution took place the day after the gift, petitioner's statement on July 7 evidences that the decision to make the distribution had already been made as of that date, if not well formally authorized by CSTC.  *See* Mich. Comp. Laws § 450.1345(1) and (2).  We thus find that, before July 13, CSTC and petitioner had distributed and/or determined to distribute over $10 million out of the corporation.

Moreover, we consider it highly improbable that petitioner and his two brothers would have emptied CSTC of its working capital if the transaction had even a small risk of not consummating.  Absent its working capital, CSTC was no longer a going concern until the transaction was finalized. *See Cook*, 5 T.C. at 911 (finding assignment of income where donor of shares was "well aware that the corporate activities had all but ceased except for the actual distribution in liquidation"); *see also Apt v. Birmingham*, 89 F. Supp. 361, 393 (N.D. Iowa 1950) (stating that gain may be realized when "for all practical purposes corporate stock had no further purposes to fulfill" aside from underlying transaction).  The bonus payouts and distributions do not

**[\*31]** appear from the record to have been in any way contingent on the final execution of the purchase agreement. Accordingly, we conclude that, once made, the bonus payouts and distributions could not be clawed back and had tax consequences upon receipt for the participating employees and shareholders, including petitioner himself.

In the reality of the transaction, the cash sweeps were thus highly significant conditions precedent to consummating the transaction with HCI. *Cf. Kinsey v. Commissioner*, 58 T.C. 259, 265–66 (1972) (finding right to income on shares from liquidation was fixed where "a substantial portion of [corporation's] assets were distributed prior to the date of the gift"), *aff'd*, 477 F.2d 1058 (2d Cir. 1973). As of July 13, 2015, the CSTC shares were essentially "hollow receptacles" for conveying proceeds of the transaction with HCI, "rather than an interest in a viable corporation." *Estate of Applestein*, 80 T.C. at 345–46; *see Hudspeth v. United States*, 471 F.2d 275, 279 (8th Cir. 1972) (describing donated shares as "merely empty vessels by which the taxpayer conveyed the liquidation proceeds"). The cash sweep strongly weighs in favor of a conclusion that the sale was a virtual certainty and thus petitioners' right to income from the shares was fixed as of July 13, 2015.

### C. *Unresolved Sale Contingencies*

Next, we look to what unresolved sale contingencies remained between the parties as of the July 13, 2015, gift. *See Robert L. Peterson Irrevocable Tr. #2*, 51 T.C.M. (CCH) at 1316–19 (focusing on various contingencies that taxpayers argued precluded their right to sale proceeds from becoming fixed before a gift). Petitioners argue that the transaction with HCI was still being negotiated up until the closing on July 15. Petitioners rely on petitioner's trial testimony, where he identified several negotiated issues, including an environmental liability, employee compensation arrangements, and excess real estate. At trial petitioner testified that he and HCI "basically negotiated right up until the day before we closed"—i.e., July 14, 2015.

However, the record does not bear out the substance of petitioner's characterization. The identified employee compensation and excess real estate issues appear to have been resolved in drafts of the agreement prepared before July 13, 2015. At trial, a representative of HCI characterized the environmental liability issue as "the one probably biggest item of negotiation" resolved before closing. On July 10, 2015, HCI's counsel prepared a draft with a new seller indemnity provision addressing the environmental liability issue. By 4:38 a.m. on

**[\*32]** the morning of July 13, when HCI's counsel next ran a redline comparison of a new draft, the environmental liability provision had already been accepted into the draft agreement. Given that the written drafts memorialized the negotiations between the parties, we find that the parties had resolved the environmental liability issue before the contribution to Fidelity Charitable.

Moreover, the only substantive change made to the drafts after the contribution to Fidelity Charitable was a minor revision to the provision for ongoing compensation to Mark and Kurt to cover the cost of their health insurance. We thus find that none of the unresolved contingencies remaining on July 13, 2015, were substantial enough to have posed even a small risk of the overall transaction's failing to close. *See Robert L. Peterson Irrevocable Tr. #2*, 51 T.C.M. (CCH) at 1319 (concluding that remaining contingencies "at best . . . represent remote and hypothetical possibilities that the stock purchase would be abandoned"); *cf. Martin v. Machiz*, 251 F. Supp. 381, 389 (D. Md. 1966) (finding no assignment of income where, at time of gift of shares, parties had "substantial" disagreements about closing date and buyer's insistence on a surety bond as security for breach of warranty). We find that petitioner, consistent with his "99% sure" statement, waited until all material details had been agreed to with HCI before he transferred the shares to Fidelity Charitable. *See Malkan*, 54 T.C. at 1314 ("Even though [the taxpayer] had discussed creating the trusts for several months, he did not establish them until the parties had agreed upon the details of the sale."). The absence of significant unresolved contingencies also weighs in favor of the sale of shares to HCI being a virtual certainty.

D.  *Corporate Formalities*

Finally, we look to the status of the corporate formalities necessary for effecting the transaction. *See Estate of Applestein*, 80 T.C. at 345–46 (finding that taxpayer's right to sale proceeds from shares had "virtually ripened" upon shareholders' approval of proposed merger agreement). Under Michigan law, a proposed plan to exchange shares must generally be approved by a majority of the corporation's shareholders. *See* Mich. Comp. Laws § 450.1703a(2)(d); *id.* § 450.1407(1). Formal shareholder approval of a transaction has often proven to be sufficient to demonstrate that a right to income from shares was fixed before a subsequent transfer. *See Ferguson*, 108 T.C. at 262; *see also Hudspeth*, 471 F.2d at 279. However, such approval is not necessary for a right to income to be fixed, when other actions taken

**[*33]** establish that a transaction was virtually certain to occur. *See Ferguson*, 104 T.C. at 262–63 (rejecting taxpayer's "attempt to impose formalistic obstacle[]" of formal shareholder approval); *see also Hudspeth*, 471 F.2d at 280 (describing final resolution to dissolve corporation as a "mere formality" where shareholders and board had already approved plan of liquidation, despite "remote, hypothetically possible abandonment[]" of that plan); *Kinsey*, 58 T.C. at 265–66.

On June 11, 2015, petitioner and his two brothers (the sole shareholders of CSTC) unanimously approved pursuing a sale of all outstanding stock of CSTC to HCI. On July 15 they provided written consent to the final Contribution and Stock Purchase Agreement with HCI. However, viewed in the light of the reality of the transaction, the record shows that final written consent was a foregone conclusion. As a practical matter, finalizing the transaction with HCI presented petitioner and his two brothers with the opportunity to partially (or fully, as in Kurt's case) cash out of CSTC at a significant premium over their initial target price of $80 million. *See Ferguson v. Commissioner*, 174 F.3d at 1004–05 (considering formal shareholder approval to be unnecessary where shareholders were receiving substantial premium). From HCI's perspective, it also believed it was acquiring CSTC at a fair price and, as of July 13, had resolved the environmental liability issue, its final significant due diligence concern. *See id.* at 1005. All three Hoensheid brothers, and particularly petitioner, were involved in negotiating the transaction, making their approval all but assured as of July 13, 2015. *Cf. Perry v. Commissioner*, T.C. Memo. 1976-381, 35 T.C.M. (CCH) 1718, 1724 (concluding that shareholder approval of sale was not just a "rubber stamp" where corporation was not "a closely held corporation controlled by the same individuals who negotiated the [a]greement"). We conclude that formal shareholder approval was purely ministerial, as any decision by the brothers not to approve the sale was, as of July 13, "remote and hypothetical." *Jones*, 531 F.2d at 1346; *see Allen*, 66 T.C. at 347 (finding assignment of income despite parties not completing "purely ministerial act of executing quitclaim deed" before transfer). This factor is neutral as to whether petitioners' right to income was fixed.

E.   *Conclusion*

To avoid an anticipatory assignment of income on the contribution of appreciated shares of stock followed by a sale by the donee, a donor must bear at least some risk at the time of contribution that the sale will not close. On the record before us, viewed in the light

**[\*34]** of the realities and substance of the transaction, we are convinced that petitioners' delay in transferring the CSTC shares until two days before closing eliminated any such risk and made the sale a virtual certainty. Petitioners' right to income from the sale of CSTC shares was thus fixed as of the gift on July 13, 2015. We hold that petitioners recognized gain on the sale of the 1,380 appreciated shares of CSTC stock.

We echo prior decisions in recognizing that our holding does not specify a bright line for donors to stop short of in structuring charitable contributions of appreciated stock before a sale. *See Allen*, 66 T.C. at 346 (rejecting proposed bright-line rule approach and noting that "drawing lines is part of the daily grist of judicial life"); *see also Harrison v. Schaffner*, 312 U.S. 579, 583–84 (1941). However, as petitioners' tax counsel seems to have recognized in her advice to petitioner, "any tax lawyer worth [her] fees would not have recommended that a donor make a gift of appreciated stock" so close to the closing of a sale. *Ferguson v. Commissioner*, 174 F.3d at 1006; *see Allen*, 66 T.C. at 346 (recognizing that realities and substance approach puts "a premium on consulting one's lawyer early enough in the game"). By July 13, 2015, the transaction with HCI had simply "proceeded too far down the road to enable petitioners to escape taxation on the gain attributable to the donated shares." *Allen*, 66 T.C. at 348.

III. *Charitable Contribution Deduction*

We have concluded that petitioners did make a valid gift, and although we have determined that gift to be an assignment of income, petitioners may nevertheless be entitled to a charitable contribution deduction under section 170. Section 170(a)(1) allows as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. "A charitable contribution is a gift of property to a charitable organization made with charitable intent and without the receipt or expectation of receipt of adequate consideration." *Palmolive Bldg. Invs., LLC v. Commissioner*, 149 T.C. 380, 389 (2017) (citing *Hernandez v. Commissioner*, 490 U.S. 680, 690 (1989)). Section 170(f)(8)(A) provides that "[n]o deduction shall be allowed . . . for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgement of the contribution by the donee organization that meets the requirements of subparagraph (B)." For contributions of property in excess of $500,000, the taxpayer must also attach to the

**[\*35]** return a "qualified appraisal" prepared in accordance with generally accepted appraisal standards. § 170(f)(11)(D) and (E).

Here, the contributed CSTC shares had a value in excess of $500,000, and petitioners were thus required to substantiate their claimed deduction with both a contemporaneous written acknowledgement (CWA) and a qualified appraisal. Respondent asserts that petitioners have failed to satisfy both requirements and thus are not entitled to a charitable contribution deduction for the gift of the CSTC shares to Fidelity Charitable.

A.     *CWA*

A CWA must include, inter alia, the amount of cash and a description of any property contributed. § 170(f)(8)(B). A CWA is contemporaneous if obtained by the taxpayer before the earlier of either (1) the date the relevant tax return was filed or (2) the due date of the relevant tax return. § 170(f)(8)(C). Section 170(f)(18)(B) adds a specific requirement for donor-advised funds that any CWA include a statement that the donee "has exclusive legal control over the assets contributed." We construe the requirements of section 170(f)(8)(B) strictly and do not apply the doctrine of substantial compliance to excuse defects in a CWA. *See 15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 562 (2016). The contribution confirmation letter issued by Fidelity Charitable was contemporaneous, acknowledged receipt of 1,380.400 shares of CSTC stock, and contained the applicable statements required by the statute, including the "exclusive legal control" statement.

Respondent argues that the contribution confirmation letter failed to satisfy section 170(f)(8)(B) because it described petitioners' contribution as shares of stock rather than cash. Respondent's argument conflates the issues in this case. As a matter of state law, we have held that petitioners made a valid gift of CSTC shares to Fidelity Charitable. However, for federal income tax purposes, we have classified those shares as carrying a fixed right to income as of July 13, 2015, such that petitioners effectively realized and recognized gains before transfer. That second holding does not disturb our conclusion that petitioners made a valid gift of stock. *See Commissioner v. Tower*, 327 U.S. 280, 287–88 (1946) (citing *Lucas v. Earl*, 281 U.S. at 114–15) (distinguishing between gift of stock's validity under state law and its treatment for federal tax purposes); *see also Vercio v. Commissioner*, 73 T.C. 1246, 1253 (1980) (observing that anticipatory assignments of

[*36] income "are not recognized as dispositive for Federal income tax purposes despite their validity under applicable State law").

We construe the section 170(f)(8)(B) requirement that a CWA include a description of the "property" contributed in the light of the settled principle that the Code "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *Nat'l Bank of Com.*, 472 U.S. at 722 (quoting *United States v. Bess*, 357 U.S. 51, 55 (1958)). While the ultimate question of "whether a state-law right constitutes 'property' or 'rights to property' is a matter of federal law," *id.* at 727, the answer to that question "largely depends upon state law," *see United States v. Craft*, 535 U.S. 274, 278 (2002); *see also Patel v. Commissioner*, 138 T.C. 395, 403–04 (2012) (applying state law as to whether contributed property was a partial interest for purposes of section 170(f)(3)). We do not interpret section 170(f)(8)(B) to require that a donee ascertain and correctly describe a contributed property interest in accordance with how that interest should be classified for federal tax law purposes. It is sufficient here that the CWA provided by Fidelity Charitable described the contributed property as shares of stock. We conclude that the CWA issued by Fidelity Charitable satisfied the requirements of section 170(f)(8)(B).

B. *Qualified Appraisal*

In the early 1980s Congress was made aware of significant abuse of section 170 stemming from overvaluation of property contributed to charities. *See Abusive Tax Shelters: Hearing Before the S. Subcomm. On Oversight of the Internal Revenue Serv. of the S. Comm. on Fin.*, 98th Cong. 71 (1983) (statement of Robert G. Woodward, Acting Tax Legis. Couns., Dep't of Treasury) ("We are very concerned with the problem of the widespread abuse of the charitable contribution provision."); *id.* at 151 (statement of M. Bernard Aidinoff, Chairman, Section of Tax'n of Am. Bar Ass'n) ("Inflating the value of assets has been a particular abuse in the charitable area, and I have got to say that it is an abuse engaged in by ordinary taxpayers."); Staff of J. Comm. on Tax'n, 98th Cong., Background on Tax Shelters, JCS-29-83, at 34 (J. Comm. Print 1983) (detailing high volume of charitable contribution deduction audits and noting difficulty for IRS in detecting instances of excessive deductions at the administrative level). Congress responded by enacting new substantiation requirements, in order to assist the IRS in detecting overvalued contributions and to deter taxpayers from playing the "audit lottery." *See* Staff of S. Comm. on Fin., Explanation of Provisions Approved by the Committee on March 21, 1984, S. Prt. 98-169 (Vol. I),

**[\*37]** at 444–45 (S. Comm. Print 1984); H.R. Rep. No. 98-861, at 998 (1984) (Conf. Rep.), *as reprinted in* 1984-3 C.B. (Vol. 2) 1, 252; *see also* Staff of J. Comm. on Tax'n, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, JCS-41-84, at 504 (J. Comm. Print 1984) (describing new substantiation requirements as intended to be "more effective in deterring taxpayers from inflating claimed deductions than relying solely on the uncertainties of the audit process and on penalties"). In particular, Congress added an off-Code provision directing the Secretary of the Treasury to promulgate regulations requiring taxpayers to obtain and attach to their returns a "qualified appraisal" when claiming deductions for charitable contributions of property exceeding certain dollar amounts. *See* Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, § 155(a), 98 Stat. 494, 691–93. In DEFRA, Congress defined a qualified appraisal as an appraisal prepared by a qualified appraiser that included certain enumerated information and "such additional information as the Secretary prescribes in such regulations." *Id.* § 155(a)(4), 98 Stat. at 692. Temporary regulations swiftly followed, *see* Temp. Treas. Reg. § 1.170A-13T (1984), setting out extensive requirements with respect to what constituted a qualified appraisal; final regulations were later issued with similarly extensive requirements, *see* Treas. Reg. § 1.170A-13.

Twenty years later, Congress amended section 170 to codify a qualified appraisal requirement. *See* § 170(f)(11) (as amended by American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 883, 118 Stat. 1418, 1631–32); H.R. Rep. No. 108-755, at 746 (2004) (Conf. Rep.), *as reprinted in* 2004 U.S.C.C.A.N. 1341, 1784. Two years after that, Congress again acted in response to publicized reports of questionable appraisal practices, amending section 170 to enumerate requirements for an individual to be a qualified appraiser. *See* Pension Protection Act of 2006, Pub. L. No. 109-280, § 1219(b)(1), 120 Stat. 780, 1084–85; Staff of J. Comm. on Tax'n, 109th Cong., General Explanation of Tax Legislation Enacted in the 109th Cong., JCS-1-07, at 606 (J. Comm. Print 2007).

Section 170(f)(11)(A)(i) now provides that "no deduction shall be allowed . . . for any contribution of property for which a deduction of more than $500 is claimed unless such person meets the requirements of subparagraphs (B), (C), and (D), as the case may be." Subparagraph (D) is the relevant one here, requiring that, for contributions for which a deduction in excess of $500,000 is claimed, the taxpayer attach a

[*38] qualified appraisal to the return. Section 170(f)(11)(E)(i) provides that a qualified appraisal means,

> with respect to any property, an appraisal of such property which—
>
> > (I) is treated for purposes of this paragraph as a qualified appraisal under regulations or other guidance prescribed by the Secretary, and
> >
> > (II) is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed under subclause (I).

The regulations in turn provide that a qualified appraisal is an appraisal document that, inter alia, (1) "[r]elates to an appraisal that is made" no earlier than 60 days before the date of contribution and (2) is "prepared, signed, and dated by a qualified appraiser." Treas. Reg. § 1.170A-13(c)(3)(i). Treasury Regulation § 1.170A-13(c)(3)(ii) requires that a qualified appraisal itself include, inter alia:

(1) "[a] description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;"

(2) "[t]he date (or expected date) of contribution to the donee;"

(3) "[t]he name, address, and . . . identifying number of the qualified appraiser;"

(4) "[t]he qualifications of the qualified appraiser;"

(5) "a statement that the appraisal was prepared for income tax purposes;"

(6) "[t]he date (or dates) on which the property was appraised;"

(7) "[t]he appraised fair market value . . . of the property on the date (or expected date) of contribution;" and

(8) the method of and specific basis for the valuation.

**[\*39]** Turning back to the statute, section 170(f)(11)(E)(ii) provides that a "qualified appraiser" is an individual who

> (I) has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations,

> (II) regularly performs appraisals for which the individual receives compensation, and

> (III) meets such other requirements as may be prescribed . . . in regulations or other guidance.

An appraiser must also demonstrate "verifiable education and experience in valuing the type of property subject to the appraisal." *Id.* cl. (iii)(I). The regulations add that the appraiser must include in the appraisal summary a declaration that he or she (1) "either holds himself or herself out to the public as an appraiser or performs appraisals on a regular basis;" (2) is "qualified to make appraisals of the type of property being valued;" (3) is not an excluded person specified in paragraph (c)(5)(iv) of the regulation; and (4) understands the consequences of a "false or fraudulent overstatement" of the property's value. Treas. Reg. § 1.170A-13(c)(5)(i). Finally, the regulations prohibit a fee arrangement for a qualified appraisal "based, in effect, on a percentage . . . of the appraised value of the property." *Id.* subpara. (6)(i).

Respondent contends that petitioners' appraisal is not a qualified appraisal because it (1) did not include the statement that it was prepared for federal income tax purposes; (2) included the incorrect date of June 11 as the date of contribution; (3) included a premature date of appraisal; (4) did not sufficiently describe the method for the valuation; (5) was not signed by Mr. Dragon or anyone from FINNEA; (6) did not include Mr. Dragon's qualifications as an appraiser; (7) did not describe the property in sufficient detail; and (8) did not include an explanation of the specific basis for the valuation. Aside from petitioners' already-rejected claim that the June 11 date of contribution was correct, petitioners do not meaningfully dispute that their appraisal had at least some defects. As a consequence, petitioners do not argue that they strictly complied with the qualified appraisal requirement. Instead, they rely on the doctrine of substantial compliance and the statutory reasonable cause defense to excuse any defects.

**[\*40]**        1.        *Substantial Compliance*

We have previously held that the qualified appraisal requirements are directory, rather than mandatory, as the requirements "do not relate to the substance or essence of whether or not a charitable contribution was actually made." *See Bond v. Commissioner*, 100 T.C. 32, 41 (1993). We thus may apply the doctrine of substantial compliance to excuse a failure to strictly comply with the qualified appraisal requirements. *See id.* As demonstrated by the relevant legislative history, the purpose of the qualified appraisal requirements is "to provide the IRS with information sufficient to evaluate claimed deductions and assist it in detecting overvaluations of donated property." *Costello v. Commissioner*, T.C. Memo. 2015-87, at \*17; *see Cave Buttes, LLC v. Commissioner*, 147 T.C. 338, 349–50 (2016); *Hendrix v. United States*, No. 2:09-CV-132, 2010 WL 2900391, at \*6 (S.D. Ohio July 21, 2010) ("[T]he purpose of the qualified appraisal is to 'show the work' so as to obviate the injection of unfounded guessing into the tax scheme."). Accordingly, if the appraisal discloses sufficient information for the Commissioner to evaluate the reliability and accuracy of a valuation, we may deem the requirements satisfied. *Bond*, 100 T.C. at 41–42; *see Hewitt v. Commissioner*, 109 T.C. 258, 265 & n.10 (1997) (describing substantial compliance as applicable where the taxpayer has "provided most of the information required" or made omissions "solely through inadvertence"), *aff'd*, 166 F.3d 332 (4th Cir. 1998). Substantial compliance allows for minor or technical defects but does not excuse taxpayers from the requirement to disclose information that goes to the "essential requirements of the governing statute." *Estate of Evenchik v. Commissioner*, T.C. Memo. 2013-34, at \*12 (quoting *Estate of Clause v. Commissioner*, 122 T.C. 115, 122 (2004)). We thus generally decline to apply substantial compliance where a taxpayer's appraisal either (1) fails to meet substantive requirements in the regulations or (2) omits entire categories of required information. *See Costello*, T.C. Memo. 2015-87, at \*24; *see also Alli v. Commissioner*, T.C. Memo. 2014-15, at \*54 (observing that substantial compliance "should not be liberally applied").

Petitioners' appraisal is deficient with respect to several key substantive requirements. We start with Mr. Dragon's status as an appraiser. We have previously described the requirement that an appraiser be qualified as the "most important requirement" of the regulations. *Mohamed v. Commissioner*, T.C. Memo. 2012-152, 2012 WL 1937555, at \*4. Respondent argues that Mr. Dragon was not a qualified appraiser, asserting that Mr. Dragon performed valuations

**[\*41]** infrequently, did not hold himself out as an appraiser, and has no certifications from a professional appraiser organization.[24] Petitioners counter that Mr. Dragon was qualified because he has prepared "dozens of business valuations" over the course of his 20+ year career as an investment banker, including some valuations of closely held automotive businesses.

Mr. Dragon's mere familiarity with the type of property being valued does not by itself make him qualified. *See, e.g.*, *Brannan Sand & Gravel Co. v. Commissioner*, T.C. Memo. 2020-76, at \*9–10, \*15 (finding that attorney's familiarity with type of property being valued and awareness of typical asking price was insufficient to satisfy qualified appraiser requirement). Mr. Dragon does not have appraisal certifications and does not hold himself out as an appraiser. We found Mr. Dragon's own words at trial about his appraisal experience to be particularly instructive. Mr. Dragon testified that he conducted valuations "briefly" and only "on a limited basis" before starting at FINNEA in 2014—the year before the appraisal. Mr. Dragon also testified that he now performs (presumably gratis) business valuations for prospective clients "once or twice a year" in order to solicit their business for FINNEA. We find Mr. Dragon's uncontroverted testimony sufficient to establish that he does not "regularly perform[] appraisals for which [he] receives compensation." *See* § 170(f)(11)(E)(ii)(II). Petitioners have failed to show that Mr. Dragon was a qualified appraiser.

We have previously described the requirement that an appraiser be qualified as one of the substantive requirements of the regulations. *See Alli*, T.C. Memo. 2014-15, at \*56–57 ("[O]btaining an appraisal from a nonqualified appraiser does not constitute substantial compliance.") Absent an appraisal prepared by a qualified appraiser, the Commissioner cannot effectively verify whether a reported charitable contribution has been properly valued. *See Mohamed v. Commissioner*,

---

[24] Respondent also argues that Mr. Dragon is precluded under the fee arrangement rule in Treasury Regulation § 1.170A-13(c)(6)(i) from serving as a qualified appraiser because of the value-based fee he and FINNEA received from CSTC for effecting the transaction with HCI: 1% of the transaction's value up to $80 million and 5% of the transaction's value over $80 million. By its plain terms, the fee arrangement rule is limited to fees that are effectively based on an appraised value (i.e., where the appraiser is incentivized to inflate a valuation in order to receive a higher fee); there was no such fee in this case, and we do not understand the rule to apply to a fee, like the one Mr. Dragon received, that is based on actual value received in a separate arm's-length transaction.

**[\*42]** 2012 WL 1937555, at \*7–8. We find that consideration to be heightened in the context of valuing a minority interest in a closely held family corporation, which often presents difficult questions for even an experienced appraiser. *See, e.g.*, *Rabenhorst v. Commissioner*, T.C. Memo. 1996-92, 1996 WL 86215, at \*2. We thus conclude that in engaging a nonqualified appraiser, petitioners failed to demonstrate substantial compliance.

Next, leaving aside the separate issue of whether Mr. Dragon was actually qualified, the appraisal itself failed to sufficiently describe any of Mr. Dragon's relevant qualifications and valuation experience. *See* Treas. Reg. § 1.170A-13(c)(3)(ii)(F). Mr. Dragon's biography provided no information relevant to his valuation experience and described only general corporate finance experience and his business school education. As noted above, Mr. Dragon testified at trial that he did have some limited experience in valuation before the appraisal at issue. The failure to include a description of such experience in the appraisal was a substantive defect. We have previously described the qualifications requirement as important because it "provide[s] necessary context permitting the IRS to evaluate a claimed deduction." *Alli*, T.C. Memo. 2014-15, at \*35 (first citing *Hendrix*, 2010 WL 2900391, at \*5 ("Without, for example, the appraiser's education and background information, it would be difficult if not impossible to gauge the reliability of an appraisal that forms the foundation of a deduction."); and then citing *Bruzewicz v. United States*, 604 F. Supp. 2d 1197, 1205 (N.D. Ill. 2009) (describing qualifications requirement as providing IRS with ability to "determine whether the valuation in an appraisal report is competent and credible evidence")). The absence of Mr. Dragon's relevant qualifications further confirms our conclusion that petitioners' appraisal failed to substantially comply, as the defect deprived the Commissioner of information necessary to evaluate whether the appraisal was reliable.

Lastly, petitioners' appraisal is substantively deficient in stating an incorrect date of contribution. We have described the date requirement as intended to enable the Commissioner "to compare the appraisal and contribution dates for purposes of isolating fluctuations in the property's fair market value between those dates." *Rothman v. Commissioner*, T.C. Memo. 2012-163, 2012 WL 2094306, at \*15, *supplemented and vacated on other grounds*, T.C. Memo. 2012-218. An incorrect date of contribution may be excused if it reflects only a minor typographical error. *See Friedberg v. Commissioner*, T.C. Memo. 2011-238, 2011 WL 4550136, at \*10 (finding substantial compliance where date discrepancies were "merely typographical errors"), *supplemented*

[*43] *by* T.C. Memo. 2013-224.  However, omission of the correct date of contribution is generally significant and will weigh against a conclusion of substantial compliance.  *See, e.g.*, *Presley v. Commissioner*, T.C. Memo. 2018-171, at *78, *aff'd*, 790 F. App'x 914 (10th Cir. 2019); *Costello*, T.C. Memo. 2015-87, at *24–25; *Alli*, T.C. Memo. 2014-15, at *24; *Smith v. Commissioner*, T.C. Memo. 2007-368, 2007 WL 4410771, at *18–19, *aff'd*, 364 F. App'x 317 (9th Cir. 2009).

Petitioners' reported June 11, 2015, date of contribution was incorrect, and thus the June 11 valuation date was premature by approximately a month.  In *Cave Buttes, LLC*, 147 T.C. at 355, we concluded that a taxpayer's appraisal was in substantial compliance, despite finding a several-week discrepancy between the actual date of contribution and the date of valuation.  That conclusion, however, was conditioned on the fact there was no "significant event that would obviously affect the value of the property in those two or three weeks." *Id.*  Here, in contrast, the period between June 11 and July 13, 2015, encompassed CSTC's initial bonus payouts of approximately $6.1 million, which had a significant effect on the value of the shares.  In addition, as we have concluded above, the underlying transaction with HCI became virtually certain to occur in the period after June 11.  The significance of these intervening developments is clear in part from the $340,545 discrepancy between the June 11 appraised value and the actual proceeds received by Fidelity Charitable for the shares on July 15.  The misreporting of the date of contribution prevented the Commissioner from effectively double-checking the accuracy of the appraised value—a concern that relates to the "essential requirements of the governing statute" and thus further confirms that petitioners cannot demonstrate substantial compliance.  *See Estate of Evenchik*, T.C. Memo. 2013-34, at *12.

This is not the rare case "where a taxpayer does all that is reasonably possible, but nonetheless fails to comply with the specific requirements of a provision." *Durden v. Commissioner*, T.C. Memo. 2012-140, 103 T.C.M. (CCH) 1762, 1763 (citing *Samueli v. Commissioner*, 132 T.C. 336, 345 (2009)).  Petitioners' failure to satisfy multiple substantive requirements of the regulations, paired with the appraisal's other more minor defects, precludes them from establishing substantial compliance.

**[\*44]**        2.        *Reasonable Cause*

Although petitioners are unable to establish substantial compliance, their defective appraisal may nevertheless be excused if petitioners had reasonable cause for their noncompliance. Taxpayers who fail to comply with the qualified appraisal requirements may still be entitled to charitable contribution deductions if they show that their noncompliance is "due to reasonable cause and not to willful neglect." § 170(f)(11)(A)(ii)(II). We have construed the reasonable cause defense in section 170(f)(11)(A)(ii)(II) similarly to the defense applicable to numerous other Code provisions that prescribe penalties and additions to tax. *See* § 6664(c)(1); *see also Chrem*, T.C. Memo. 2018-164, at \*18–19; *Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*98–99. Reasonable cause thus requires that a taxpayer "have exercised ordinary business care and prudence as to the challenged item." *Crimi*, T.C. Memo. 2013-51, at \*99 (citing *United States v. Boyle*, 469 U.S. 241 (1985)). To show reasonable cause due to reliance on a professional adviser, we generally require that a taxpayer show (1) that their adviser was a competent professional with sufficient expertise to justify reliance; (2) that the taxpayer provided the adviser necessary and accurate information; and (3) that the taxpayer actually relied in good faith on the adviser's judgment. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

Respondent argues that petitioners cannot show reliance in good faith, because petitioner—not Ms. Kanski—made the decision to have Mr. Dragon perform the appraisal without verifying that he was sufficiently qualified. Respondent suggests that petitioner's decision to have Mr. Dragon perform the appraisal, despite receiving a quote from a national accounting firm, was largely motivated by the fact that Mr. Dragon would not charge an additional fee for the work. Petitioners argue that they have satisfied each factor of the *Neonatology* test with respect to the defective appraisal. Petitioners argue that Ms. Kanski was closely involved in reviewing the appraisal, meeting with Mr. Dragon, and advising petitioners that the appraisal met the statutory and regulatory requirements.

Petitioners have established that Ms. Kanski was competent and professionally experienced in tax and estate planning issues. *See 106 Ltd. v. Commissioner*, 136 T.C. 67, 77 (2011) (finding taxpayer's longtime personal attorney and return preparers to be adequately competent professionals with respect to taxpayer), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012). In addition, Ms. Kanski was involved both in reviewing

**[\*45]** drafts of the transactional documents and in the ongoing discussions with petitioners' wealth advisers about the contribution. She thus had the underlying knowledge necessary to procure a qualified appraisal of the shares.

However, Ms. Kanski's handling of the process does not necessarily insulate petitioners from the consequences of the defective appraisal. *See Stough v. Commissioner*, 144 T.C. 306, 323 (2015) ("Unconditional reliance on a tax return preparer or C.P.A. does not by itself constitute reasonable reliance in good faith; taxpayers must also exercise '[d]iligence and prudence'." (quoting *Estate of Stiel v. Commissioner*, T.C. Memo. 2009-278, 2009 WL 4877742, at \*2)). Petitioner is an experienced and sophisticated businessman. *See* Treas. Reg. § 1.6664-4(c)(1) (stating that "[a]ll facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice" and that "the taxpayer's education, sophistication and business experience will be relevant"). Petitioner made a business decision to have CSTC's transactional adviser conduct the appraisal gratis, rather than engage a national accounting firm on a paid basis. Given Mr. Dragon's admittedly limited experience and unfamiliarity with the qualified appraisal process, such a decision did not demonstrate ordinary business care and prudence. *See, e.g.*, *Webster v. Commissioner*, T.C. Memo. 1992-538, 1992 WL 220112, at \*4 (describing taxpayer's decision to engage unqualified adviser as "not a technical matter, but one calling for ordinary human wisdom and careful deliberation"). Petitioners have not provided credible evidence, aside from self-serving uncorroborated testimony, that they reasonably relied upon Ms. Kanski's judgment in proceeding with that unwise course of action.[25]

In addition, petitioner's close involvement in the contribution and transaction requires us to cast a skeptical eye to his claim that he relied in good faith on Ms. Kanski as to the appraisal's incorrect date of contribution. The record firmly establishes that petitioner did not transfer the shares to Fidelity Charitable on June 11. The transactional

---

[25] We do not ignore Ms. Kanski's email of April 16, in which she asked Mr. Hensien to inquire whether FINNEA could perform the appraisal as it "would seem to be the most efficient method." Ms. Kanski's preliminary inquiry to a colleague on behalf of petitioners does not speak to whether she ultimately exercised her judgment to advise petitioners that Mr. Dragon was qualified to conduct the appraisal nor to whether petitioners actually relied on that judgment. *See, e.g.*, *Pankratz v. Commissioner*, T.C. Memo. 2021-26, at \*26. The record is devoid of credible evidence on this point.

**[\*46]** documents, petitioner's contemporaneous emails, and the retention of the undated physical stock certificate strongly suggest that petitioner knew or at least should have known that the shares were not contributed to Fidelity Charitable on June 11. *See* Treas. Reg. § 1.6664-4(c)(1)(ii) (stating that for reliance to constitute reasonable cause "the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true"); *see also Exelon Corp. v. Commissioner*, 906 F.3d 513, 529 (7th Cir. 2018), *aff'g* 147 T.C. 230 (2016); *Blum v. Commissioner*, 737 F.3d 1303, 1318 (10th Cir. 2013), *aff'g* T.C. Memo. 2012-16. Consequently, we also conclude that petitioners have failed to establish good faith reliance on Ms. Kanski's judgment that the appraisal properly reported the required information, because petitioner knew or should have known that the date of contribution (and thus the date of valuation) was incorrect.

We find that petitioners did not have reasonable cause for their failure to procure a qualified appraisal. Consequently, we must sustain respondent's determination to disallow their charitable contribution deduction.

IV. *Section 6662(a) Penalty*

Section 6662(a) and (b)(1) and (2) imposes a 20% penalty on any underpayment of tax required to be show on a return that is attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax. Negligence includes "any failure to make a reasonable attempt to comply" with the Code, § 6662(c), or a failure "to keep adequate books and records or to substantiate items properly," Treas. Reg. § 1.6662-3(b)(1). An understatement of income tax is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. § 6662(d)(1)(A).

Respondent argues that petitioners are liable for a penalty under section 6662(a) on the basis of both negligence and a substantial understatement of income tax. Generally, the Commissioner bears the initial burden of production of establishing via sufficient evidence that a taxpayer is liable for penalties and additions to tax; once this burden is met, the taxpayer must carry the burden of proof with regard to defenses such as reasonable cause. § 7491(c); *see Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). However, the Commissioner bears the burden of proof with respect to a new penalty or increase in the amount of a penalty asserted in his answer. *See Rader*

[*47] *v. Commissioner*, 143 T.C. 376, 389 (2014) (citing Rule 142(a)), *aff'd in part, appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015); *see also RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 38–39 (2017), *aff'd sub nom. Blau v. Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019).

Respondent has conceded that petitioners are not liable for the section 6662(a) penalty determined in the notice of deficiency, which related to the disallowed charitable contribution deduction. Instead, in his amended Answer, respondent asserted a new section 6662(a) penalty, which relates to his argument that petitioners underreported capital gains because of an anticipatory assignment of income. Consequently, respondent bears the burden of proving that no affirmative defense, such as reasonable cause, exculpates petitioners from a section 6662(a) penalty. *See Full-Circle Staffing, LLC v. Commissioner*, T.C. Memo. 2018-66, at *43, *aff'd in part, appeal dismissed in part*, 832 F. App'x 854 (5th Cir. 2020).

As part of the burden of production, respondent must satisfy section 6751(b) by producing evidence of written approval of the penalty by an immediate supervisor, made before formal communication of the penalty to petitioners. *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *see also Clay v. Commissioner*, 152 T.C. 223, 246 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021). Here, the emailed approval by the immediate supervisor of respondent's counsel is sufficient to establish compliance with section 6751(b) before formal communication to petitioners of the section 6662(a) penalty. *See Estate of Morrissette v. Commissioner*, T.C. Memo. 2021-60, at *119 ("Emails may constitute written supervisory approval.").

However, section 6664(c)(1) provides that a section 6662 penalty will not be imposed for any portion of an underpayment if the taxpayers show that (1) they had reasonable cause and (2) acted in good faith with respect to that underpayment. A taxpayer's mere reliance "on an information return or on the advice of a professional tax adviser or an appraiser does not necessarily demonstrate reasonable cause and good faith." Treas. Reg. § 1.6664-4(b)(1). That reliance must be reasonable, and the taxpayer must act in good faith. *Id.* In evaluating whether reliance is reasonable, a taxpayer's "education, sophistication and business experience will be relevant." *Id.* para. (c)(1). A taxpayer's "honest misunderstanding of fact or law that is reasonable in light of all

**[\*48]** of the facts and circumstances" may also constitute reasonable cause. *Id.* para. (b).

While we have held that petitioners did not have reasonable cause for their failure to comply with the qualified appraisal requirement, petitioners' liability for an accuracy-related penalty presents a separate issue—and one for which respondent bears the burden of proof. Accordingly, respondent must show that (1) Ms. Kanski was not a competent professional with sufficient expertise to justify reliance; (2) petitioners failed to provide her with necessary and accurate information; or (3) petitioners did not actually rely in good faith on her judgment. *See Neonatology Assocs., P.A.*, 115 T.C. at 99; *see also Full-Circle Staffing, LLC*, T.C. Memo. 2018-66, at \*43–44.

We have already found that Ms. Kanski was competent and experienced and that she was provided with the necessary details of the transaction and contribution. The record establishes that Ms. Kanski advised petitioners that their deadline to contribute the shares and avoid capital gains was "prior to execution of the definitive purchase agreement." Petitioner did not follow Ms. Kanski's supplemental advice to have the paperwork for the contribution ready to go "well before the signing of the definitive purchase agreement." Petitioner's statements that he "would rather wait as long as possible to pull the trigger" until he was "99% sure" the sale would close suggest some disregard of his counsel's advice as to the timing of the contribution. *See, e.g.*, *Medieval Attractions N.V. v. Commissioner*, T.C. Memo. 1996-455, 1996 WL 583322, at \*61 ("[The taxpayers] cannot claim reliance on their advisers' advice if they failed to follow it."). However, while petitioners disregarded Ms. Kanski's cautionary note as to the timing, they did adhere to the literal thrust of her advice: that "execution of the definitive purchase agreement" was the firm deadline to contribute the shares and avoid capital gains. The anticipatory assignment of income issue (and thus the underlying accuracy of Ms. Kanski's advice) was the subject of contention by the parties in this case. We do not consider the anticipatory assignment of income issue to be so clear cut that petitioner should have known it was unreasonable to rely on Ms. Kanski's advice. *See Robert L. Peterson Irrevocable Tr. #2*, 51 T.C.M. (CCH) at 1321 (finding reasonable cause for accuracy-related penalty where anticipatory assignment of income issue was "vigorously litigated" with "facts going in both directions"). While Ms. Kanski's advice on an issue of substantive tax law was ultimately incorrect, we conclude that it was reasonable for petitioner to rely on it. *See Boyle*, 469 U.S. at 251.

**[\*49]** Further, respondent has failed to establish any bad faith with respect to petitioners' reliance on the advice.

We conclude that respondent has failed to establish that petitioners did not have reasonable cause under section 6664(c)(1) for their underpayment of tax. We will not sustain respondent's determination of a section 6662(a) penalty.

V. *Conclusion*

For the foregoing reasons, we hold that (1) petitioners made a valid gift of the CSTC shares on July 13, 2015; (2) petitioners realized and recognized gain because their right to proceeds from the sale became fixed before the gift; (3) petitioners are not entitled to a charitable contribution deduction; and (4) petitioners are not liable for a section 6662(a) penalty. We have considered all of the arguments made and facts presented by the parties in reaching our decision and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*